**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**The LORBEN CORPORATION,
Respondent.**

**No. 309, Docket 29236.**

United States Court of Appeals
Second Circuit.

Argued Jan. 21, 1965.

Decided May 3, 1965.

Friendly, Circuit Judge, dissented.

Michael R. Brown, Attorney, National Labor Relations Board (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, Elliott Moore, Attorney, National Labor Relations Board, on the brief), for petitioner.

Abraham I. Litwack, Uniondale, N. Y., for respondent.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order against The Lorben Corporation issued May 11, 1964 and reported at 146 N.L.R.B. No. 174. As the result of our determination of the merits we find it unnecessary to discuss the challenge to the procedure of consolidating the original charge and complaint with the second ones other than to say that the procedure was proper, see Coca-Cola Bottling Co. v. NLRB, 195 F.2d 955, 956 (8 Cir. 1952).

The basic facts are simple and undisputed. On April 1, 1963 Local 1922, International Brotherhood of Electrical Workers, AFL–CIO, began organizing respondent's plant and secured the adherence of four of the 25 or 26 employees. On April 4 the union held a meeting to decide what to do about the discharge of one of the employees believed to have been discharged for union activities. A strike was decided upon and picketing began the next day with placards reading: "Employees of Lorben Electronics Corporation on Strike—Please help us maintain decent working conditions." About two days later the discharged employee asked respondent's president whether he wanted to have any discussions with the union's officials and the president said he did not want to do so. Subsequently, respondent's president, on advice of counsel, prepared a paper with a question: "Do you wish Local 1922 of the Electrical Workers to represent you?" Under this were two columns, "yes" and "no." The plant superintendent handed the sheet to each employee explaining to each that each was free to sign or not sign. This was done throughout the plant. All of the employees signed in the "no" column. There is no evidence of any employee hostility to the union and the Trial Examiner found an absence of any "other unfair labor practices." However, the Examiner found that the respondent had violated the Act. While the Examiner mentioned the failure of respondent to advise the employees of the purpose of the interrogation and to assure them that no reprisals would follow, he based his decision primarily on his finding that the respondent had no legitimate purpose for the interrogation. The Board based its decision on the first

two reasons and refused to rely on the third. We deny enforcement of the Board's order.[1]

Employer interrogation of employees as to their desire to be represented by a particular union is not coercive or intimidating on its face. It is extremely difficult to determine how often and under what circumstances threats will be inferred by the employees. The resulting confusion from efforts to set up basic ground rules in this field is carefully explored by Prof. Derek C. Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L. Rev. 38, 106 (1964).

The problem of delineating what is coercion by interrogation has resisted any set rules or specific limitations. The Board's original determination that interrogation by the employer was unlawful per se, Standard-Coosa-Thatcher Co., 85 N.L.R.B. 1358 (1949), was disapproved by the courts and the Board retreated to the position that interrogation would only be unlawful where it was found to be coercive in the light of all surrounding circumstances. As the Board stated in Blue Flash Express, Inc., 109 N.L.R.B. 591, 594 (1954): "We agree with and adopt the test laid down by the Court of Appeals for the Second Circuit in the Syracuse Color Press case [209 F.2d 596, cert. denied, 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108 (1954)] which we construe to be that the answer to whether particular interrogation interferes with, restrains, and coerces employees must be found in the record as a whole." In Bourne v. NLRB, 332 F.2d 47, 48 (2 Cir. 1964), this Circuit reaffirmed this comprehen-

---

1. The Board, modifying the Trial Examiner's order which forbade interrogation concerning union activity "without legitimate purpose and without proper safeguards," ordered respondent to cease and desist from:

"(a) Interfering with, restraining, or coercing its employees in the exer-

cise of their rights guaranteed by Section 7 of the Act by interrogating them concerning their union activities or sympathies or by polling them in a manner constituting restraint and coercion within the meaning of Section 8 (a) (1) of the Act."

sive approach and we attempted to suggest some of the many factors that must be considered anew in each case to determine whether a particular interrogation is coercive:

"(1) The background, i. e. is there a history of employer hostility and discrimination?

"(2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?

"(3) The identity of the questioner, i. e. how high was he in the company hierarchy?

"(4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?

"(5) Truthfulness of the reply."

See also Welch Scientific Co. v. NLRB, 340 F.2d 199 (2 Cir. 1965).

Recently, the Board has withdrawn from this more comprehensive approach and has sought to establish the rule that employer interrogation is coercive in the absence of a showing that (1) there is a valid purpose for obtaining the information; (2) this purpose is communicated to the employees; and (3) the employees are assured that no reprisals will be taken, cf. Johnnie's Poultry Co., 146 N. L. R. B. No. 98, p. 7 (April 17, 1964);[2] Bok, supra, at 107. In the instant case, the Board applied this rule. It acknowledged that respondent had a valid purpose in conducting the poll, namely, to

determine whether the union represented a majority of its employees for the purpose of deciding whether recognition should be extended. Yet the Board found that respondent had committed an unfair labor practice simply because of "the manner in which the poll was conducted, particularly the fact that Respondent did not explain the purpose of the poll to all of the employees, and did not offer or provide any assurances to the employees that their rights under the Act would not be infringed."

██ To enforce the Board's order which rests on this narrow ground alone, would be to depart from the line of decisions of this Circuit cited above, once approved by the Board, and we are not so inclined. While it is true that questioning can very well have a coercive effect where the purpose is not explained and there are no assurances against retaliation, cf. NLRB v. Camco, Inc., 340 F.2d 803 (5 Cir. 1965), we hold that the absence of these two factors, without more and in the face of the undisputed facts in the record of this case, fails to show coercion within the meaning of section 8(a) (1).

The record of this case shows the following. Respondent owned a small plant of some 25 or 26 employees. A strike was called and a picket line had been set up after an employee had been discharged. The discharged employee asked management if it wanted to hold discussions with the union. The poll of employees followed. It was completed within the same day and this was the only poll that was taken. There was no showing of any employer hostility to the union nor any showing of any "other unfair labor

2. However, in Johnnie's Poultry Co. there were findings that the employer had threatened to close the plant, showed evidence of "union animus" and demonstrated an absence of good faith, as well as an unlawful refusal to bargain in violation of section 8(a) (5) of the Act. Similarly in Frank Sullivan & Co., 133 N.L.R.B. 726 (1961), there was a find-ing that the employer had "indicated an antipathy toward the Union"; and in Orkin Exterminating Co., 136 N.L.R.B. 399 (1962) it was recognized that the questioning occurred "in a context of threats to close the plant if the Union organized it" and after "pressure [had been] put on employees to withdraw their union cards."

practices."[3] This record does not contain substantial evidence sufficient to support the Board's conclusion that the interrogation was coercive and enforcement must be denied.

FRIENDLY, Circuit Judge (dissenting):

The Board supported its conclusion that Lorben "violated 8(a)(1) of the Act in polling the employees" by saying that it relied "principally on the manner in which the poll was conducted, particularly the fact that Respondent did not explain the purpose of the poll to all of the employees, and did not offer or provide any assurances to the employees that their rights under the Act would not be infringed."

I fail to understand on what basis, in a case like this, we may properly reject the conditions to permissible interrogation which the Board has developed[1] and here enforced. The Board's adoption, in Blue Flash Express, Inc., 109 N.L.R.B. 591, 594 (1954), of language used by this court in granting enforcement in NLRB v. Syracuse Color Press, Inc., 209 F.2d 596, 599 (2 Cir.), cert. denied, 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108 (1954), did not prevent it from later concluding, in the light of experience, that proper administration demanded working rules for reconciling the employer's desire to know what was afoot and the employees' need to be free from harassment, which would provide a test more definite, and more readily applicable, than "whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act," 109 N.L.R.B. at 593. See NLRB v. A. P. W. Prods.,

Inc., 316 F.2d 899, 905–906 (2 Cir. 1963); Dickinson, Administrative Justice and the Supremacy of Law in the United States 143, 205 (1927). An agency receiving over 14,000 unfair labor practice charges a year, see 28 NLRB Ann.Rep. 161 (1963), ought not be denied the right to establish standards, appropriate to the statutory purpose, that are readily understandable by employers, regional directors and trial examiners, and be forced to determine every instance of alleged unlawful interrogation by an inquiry covering an employer's entire union history and his behavior during the particular crisis and to render decisions having little or no precedential value since "the number of distinct fact situations is almost infinite." See Bok, supra note 1, at 111, and also at 64–65. The Board's power to rule that certain types of conduct constitute unfair labor practices without further proof of motivation or effect has been sustained in cases too numerous for anything more than illustrative citation. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) (prohibition of union solicitation on company premises outside of working hours); Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) (one-year rule on duty to bargain); NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (*per se* violations of duty to bargain); NLRB v. Marcus Trucking Co., 286 F.2d 583 (2 Cir. 1961) (contract bar rule).

It is true, as Professor Bok has also written, that one may well be "reluctant to find that he [an employer] has broken the law on the basis of inadvertent or uncalculating behavior which has created no more than a speculative risk of in-

---

3. The Trial Examiner's report is replete with such statements as "I reach the foregoing conclusion notwithstanding the absence of expression of employer hostility to the Union, or of other unfair labor practices" and "There is no evidence of union animus by the Respondent."

1. The development is indicated by such cases as Frank Sullivan & Co., 133 N.L.R.B. 726 (1961); Orkin Exterminating Co., 136 N.L.R.B. 399 (1962); and Johnnie's Poultry Co., 146 N.L.R.B. No. 98 (1964). See Bok, The Regulation of Campaign Tactics in Respresentation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 107 (1964).

timidating employees," and that in cases of that sort "one may justly question whether much can be done by faulting the employer long after the conduct in question has occurred." Bok, supra note 1, at 111. In such cases insistence on literal compliance with the three criteria stated in the majority opinion may appear to ignore the realities of industrial life. Bourne v. NLRB, 332 F.2d 47, 48 (2 Cir. 1964), Federation of Union Representatives v. NLRB, 339 F.2d 126, 130–132 (2 Cir. 1964), and NLRB v. Park Edge Sheridan Meats, Inc., 341 F.2d 725 (2 Cir. 1965), in which we denied enforcement, were situations of that sort.[2] But here we are dealing with employer conduct which was systematic and purposive, indeed taken after consultation with an attorney; the inquiry covered all the employees, and the answers were formalized by signatures on a list returned to the employer. Strict rules may not suit the casual question privately put to a few employees. But when the employer sets in motion a formal tabulation of this sort, it is not too much to ask that he provide some explanation and assure his employees against reprisal. Although my brothers condemn the Board's requirements, they do not explain why these rules are inappropriate or, more relevantly, why the Board may not reasonably think them so. NLRB v. Local 50, American Bakery, etc., Workers, 339 F.2d 324, 327–328 (2 Cir. 1964).

While the Board relied "primarily" on the lack of explanation and assurance, the trial examiner's report which it adopted points to further circumstances supporting its conclusion. The interro-

gation occurred when several employees had been picketing the plant and one had been fired for what some workers apparently thought was pro-union activity; that this latter charge was not borne out cannot alter the cast thereby given to the inquiry into union support at that time. And one need not hold a doctoral degree in psychology to realize that the method of polling here utilized, in contrast to other methods of testing employee sentiment that were readily available, entailed serious risk that some employees would indicate a position quite different from that really held and would then feel obliged to adhere to it. Whether by design or by accident, the first workers to be questioned might be preponderantly against the union; the display of such votes would inevitably affect later voters who would be inclined to "follow the leader" and would see little use in bucking a trend; and all this could have a snowballing effect. I cannot believe that if the Board had utilized its rule-making power, under § 6 of the Act, see Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729 (1961), to prohibit such a means of ascertaining employee views as tending to "interfere with" rights guaranteed by § 7, and insisted on methods whereby each employee would indicate his sentiments without knowing those of others, any court would strike that down. I see no justification for a different result when the Board has followed the equally valid course of reaching its conclusion by the decision of a particular case. See NLRB v. A. P. W. Prods., Inc., supra, 316 F.2d at 905.

I would grant enforcement.

2. In Welch Scientific Co. v. NLRB, 340 F.2d 199 (2 Cir. 1965), neither the Trial Examiner's report nor the Board's decision referred to the three-fold criteria, and the Board's brief in this court sought to justify the order as to interro-

gation only on the basis of lack of any proper purpose. Compare S. H. Kress & Co., 137 N.L.R.B. 1244 (1962), enforcement denied, 317 F.2d 225 (9 Cir. 1963).