INTERNATIONAL UNION OF OPERAT-
ING ENGINEERS, LOCAL 49,
AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 19238.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 21, 1965.

Decided Nov. 4, 1965.

Edgerton, Senior Circuit Judge, dissented.

Mr. Ronald A. Jacks, Washington, D. C., for petitioner.

Mr. Michael R. Brown, Attorney, National Labor Relations Board, of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Solomon I. Hirsh, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before EDGERTON, Senior Circuit Judge, and DANAHER and WRIGHT, Circuit Judges.

DANAHER, Circuit Judge:

The General Counsel's complaint charged that Struksnes Construction Co., Inc. of Minot, North Dakota (herein, Employer), had violated section 8(a) (1), 29 U.S.C. § 158(a) (1), by conducting an open, signed poll of its employees to determine whether they wished the Employer to bargain with the Union, and section 8(a) (5), 29 U.S.C. § 158(a) (5), by refusing to bargain with the Union. Reversing the Trial Examiner, a panel [1] of the Board, by a divided vote, entered its Decision and Order of September 28, 1964, dismissing the complaint.[2] The Union's motion for reconsideration or rehearing was denied by order of March 25, 1965, reaffirming the original decision.

---

1. Board action had been delegated to a 3-member panel pursuant to § 3(b) of the Act, 29 U.S.C. § 153(b) (1964).

2. 148 NLRB No. 136 (1964).

In the latter part of July 1963, the Union's area representative, McPherson, commenced organizational activity at a road construction job for which the Employer had been awarded a contract by the North Dakota Highway Department. The Employer's president, Mr. Struksnes, was away much of the time attending to other highway projects.

The record did not show when Struksnes was expected to return to Minot, but it is clear that McPherson on August 7, 1963 consulted the Employer's attorney, Van Sickle, and asked him to arrange a meeting with Struksnes. There was no evidence that Van Sickle then had authority to commit the Employer to any particular course, or to speak for the Employer in terms of possible doubt as to the status of the Union membership. McPherson testified that he "felt" he "had the majority of the people and felt that we should sit down and talk about a contract."[3] Under date of August 9, 1963, Van Sickle wrote to McPherson:

"Dear Bob:

Re: Our File No. 5034—Struksnes Construction, Inc.

"In preparation to discuss your labor agreement with Christ Struksnes, I wonder if you would tell me the number of employees Christ Struksnes has, who are members of your Union as of a specific date, (I would suggest, for instance, this last pay day, or any other pay day), so that when I talk the matter over with Christ I can show him the representation."[4]

McPherson under date of August 12, 1963 responded:

"Dear Bruce:

RE: Your File #5034—Struksnes Construction Inc.

"In checking over my lists, I find that as of last Friday, August 9, I represent 20 men on Struksnes' job. If there is anything else that you need, please let me know. If it is possible, I would like a meeting set up at your and Christ's earliest convenience."

[Sgd.] "Bob McPherson"

The record is silent as to details of developments following the "Bruce" and "Bob" correspondence until as of August 16, 1963, Van Sickle wrote to "Dear Bob" that

"Christ Struksnes has now informed me that a majority of his men have advised him that they do not want him to negotiate with you *with reference to a contract*. I feel that I should advise you of this immediately * * *" (Emphasis added.)

It thus would seem that at least as of August 16th, and probably earlier, Struksnes had returned and had conferred with Van Sickle. We may assume that the latter must have informed Struksnes of the contents of McPherson's letter of August 12. Also, we do not doubt that by the 16th, Van Sickle definitely represented the Employer, and thus felt impelled "in good faith" to apprise McPherson that a majority of the men in the appropriate unit did not want Struksnes "to negotiate with you with reference to a contract."

3. The Trial Examiner and the Board found that there were 26 employees in the appropriate unit of whom 14 were members of the Union.

4. This letter had not been introduced in evidence and apparently it was not before the Board at the time the Board reached its first decision in September. The Union attached it to its motion for reconsideration. In denying reconsideration, the Board's order noted that on September 28, 1964, "a three-member panel of the Board issued a Decision and Order," and its text further recited:

"*The full Board* has duly considered the matter, and, while conceding that there was a factual error in the Decision, does not consider the error fatal to the conclusion reached therein." (Emphasis added.)

McPherson testified that the Employer had shown no bias in its employment, whether with respect to men who had previously been members of the Union or to those who had been organized in late July or early August as a result of McPherson's activities. McPherson testified further that neither the Employer nor his representatives had interfered with his solicitation of the employees, either before August 7, before August 12th or thereafter, even at the job site when Struksnes himself was on the job and was aware of McPherson's activities.[5]

In that setting, even when considered with an episode we next will reach, there was ample basis for the Board's conclusion that the General Counsel had failed to establish the allegations with respect to the claimed section 8(a) (5) violation. The record as a whole substantially supports that conclusion. There had been no strike, no evidence of anti-union animus as the Board found, no discrimination and no firing because of union activity.[6] There had been no substantial evidence of coercion of the employees or of actual restraint of their exercising their section 7 rights.

 But with respect to the section 8(a) (1) charge, the Employer had taken one step which we deem fateful.[7] We are by no means satisfied with the Board's ad hoc acquiescence in, if not approval of, the manner in which the Employer polled his men. Commencing some time after the McPherson letter of August 12, text *supra*, p. 853, Struksnes "went up and asked the guys. All I did was ask them. I told them what was up here, and I asked them to sign yes or no, and it wouldn't make any difference. It was up to those guys."

What "was up here" on Exhibit No. 7 was the following question addressed to

"THE MEN OF STRUCKSNES [*sic*] CONSTRUCTION CO.

"DO YOU WANT ME TO BARGAIN WITH AND SIGN A CONTRACT WITH OPERATING ENGINEERS LOCAL 49?

"PLEASE SIGN YOUR NAME AND ANSWER YES OR NO."

Twenty-four men signed their names upon that statement, nine voting "yes," fifteen "no," with one refusing to sign at all. The Employer had called no meeting of the men at which he might explain his purpose to ascertain whether or not the men desired a union contract on this particular job,[8] and assure them of no reprisals. Struksnes personally at the end of one shift presented the statement to each of the employees then available for his approach. His two foremen reached the remaining employees in like manner. How each man voted was known to the Employer or his foremen, not only at the time each man signed, but as a matter of record thereafter, just as the General Counsel's Exhibit 7 made manifest.

We can understand an inference that the men, members of the Union or not, might actually have voted in good faith not to have a union contract on this job; they might have wanted all the work they could get, even up to 9 P.M. on the second shift, before the "freeze-up" and the darkness of winter set in, precluding

---

5. Struksnes in early September informed McPherson that he was willing that McPherson have a "consent election with the proper officials to determine the wishes of the men." No such consent election was sought either by the Employer or by the Union.

6. Cf. N.L.R.B. v. Camco, Incorporated, 340 F.2d 803, 805, 806 (5 Cir. 1965).

7. The Board concluded, in effect, that the Employer had acted "inartfully" in an attempt to clear up a "good faith" doubt

that the Union actually had its claimed majority.

8. Apparently the grading and dirt-moving work was to be concluded within a period of some three months. The men had talked among themselves and with the foremen of the two shifts. They were "worried" about "losing time" since some of the scraper hands were then getting 56 hours per week. If the Union came in, "they might make us have another man for it," one foreman thought.

further employment. The question on the Exhibit is equivocal to be sure, and seems not to have been directed to an ascertainment of union affiliation of the employees or of their activities, pro or con. On the other hand, as the Board itself has observed,

"[A]ny employer who engages in interrogation does so with notice that he risks a finding of unfair labor practices if the circumstances are such that his interrogation restrains or interferes with employees in the exercise of their rights under the Act." [9]

But how can he know when he will be deemed to have acted at his peril?

In the Board's Decision and Order in the *Lorben Corporation* case, [10] the.Trial Examiner's findings, conclusions and recommendations were adopted. A section 8(a) (1) violation was found, notwithstanding the absence of expression of employer hostility to the union or of other unfair labor practices. The *Blue Flash* doctrine there deemed applicable by the Trial Examiner was adopted by the Board which noted specifically

"[W]e rely principally on the manner in which the poll was conducted, particularly the fact that Respondent did not explain the purpose of the poll to all of the employees, and did not offer or provide any assurances to the employees that their rights under the Act would not be infringed. Johnnie's Poultry Co., 146 NLRB 770."

Finding a section 8(a) (1) violation in the latter case, the Board at page 775 defined the purposes of an employer poll which have been held to be legitimate and pronounced "specific safeguards designed to minimize the coercive impact of such employer interrogation." One such was that the questioning "must occur in a context free from employer hos-

tility to union organization and must not be itself coercive in nature." There the company attorney had interviewed the employees, explaining his status and his purpose in investigating a charge which the union had filed against the company. He assured each employee that his rights were protected by law and would be respected. Each employee had been asked to identify his signature on the photostat of his union authorization card, and other details were developed. There, said the Board, was an unfair labor practice; no, said the Court of Appeals.

The Board in the instant case has made no reference to its Johnnie's Poultry Co.[11] doctrine. The Board here simply dismisses, *sub silentio*, the development of a permanent record of the votes of each employee set against his signature after interrogation had been conducted in personal approach by the employer and his foremen, and otherwise under the circumstances we outlined. Although a majority of the employees were members of the union, had they succumbed to coercion when they voted in the negative upon being queried as to whether or not they desired their employer to enter into a contract with their union? The Board's Decision and Order discloses no treatment of the possibly inherent restraint resulting from such contacts. There was no attempt at reconciliation of the Board's assessment of the situation here with the section 8(a) (1) violations as found by the Board in *Lorben*, *supra* note 10, and in *Johnnie's Poultry Co.*, *supra* note 11.

We may assume that a year-round industrial establishment poses different problems from those arising on a road grading operation lasting only a few weeks or months. But the Act makes no exception for conditions thus varying, for it leaves treatment to the Board as a matter of policy. The rights of the employees must be safeguarded nonethe-

9. Blue Flash Express, Inc., 109 NLRB 591, 594 (1954).

10. 146 NLRB 1507 (1964), reversed and enforcement denied, N.L.R.B. v. Lorben Corporation, 345 F.2d 346 (2 Cir. 1965).

11. See N.L.R.B. v. Johnnie's Poultry Co., 344 F.2d 617 (8 Cir. 1965), reversing and denying enforcement as ordered by the Board in 146 NLRB 770.

less. So it is we do not understand how the Board could approve the tactics here utilized, the technique employed, or the form in which ascertainment of the attitude of the men was sought.

In respect of the conclusion here reached by the Board,[12] its reasoning seems to have applied and found satisfied the criteria suggested in *Blue Flash Express, Inc.*[13] In our judgment, that is not enough especially since the Board position clearly lacks vitality when its opinion notes "that Struksnes did not conduct this poll until after the union had declined to answer its query concerning the dates on which the members had joined." That statement was erroneous, as the Board later was bound to concede. (See note 4, *supra*, and related text.) Assuming that such "dates" were material, the Union's letter of August 12,

text *supra*, p. 853, represented "that as of last Friday, August 9, I represent 20 men on Struksnes' job." That claim had been submitted in specific reply to Attorney Van Sickle's inquiry.

 We think the Board should come to grips with this constantly recurring problem [14] for the protection of the employees as to their section 7 rights and for that of an employer acting in good faith. It would seem that the Board could, in the exercise of its expertise,[15] develop appropriate policy considerations [16] and outline at least minimal standards to govern the ascertainment of union status, or even in given permissible situations, the desire of the employees respecting a contract with the Union.[17]

We will set aside the Board's order and remand this case for further con-

12. The Board's Decision and Order recited "[W]e are convinced that it [the Employer] was merely seeking, however inartfully, to determine whether the Union's claimed majority was reasonably current."

13. *Supra* note 9. But see Cannon Electric Co. and Charles H. Warren, 151 NLRB No. 141 (1965).

14. The Board itself said in Cannon Electric Co. and Charles H. Warren, *supra* note 13:
 "An employer cannot discriminate against union adherents without first determining who they are. The Board is *continually confronted* with cases involving unlawful discrimination against employees where the prelude to the discrimination was the employer's attempt systematically to investigate the sympathies of his employees." (Emphasis added. Cf. note 17, *infra*.)
 Of course the Board in the instant case, overruling its Trial Examiner, had found no unfair labor practice. Our own approach to their conflicting inferences and conclusions in terms of Univeral Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), is summarized in N.L.R.B. v. Camco, Incorporated, *supra* note 6, 340 F.2d at 808, 809.

15. Cf. Securities and Exchange Comm. v. Chenery Corp., 332 U.S. 194, 202, 203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947).

16. We agree with the views set forth in Judge Friendly's dissenting opinion in N.L.R.B. v. Lorben Corporation, *supra* note 10, 345 F.2d at 349, 350; and see Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 YALE L.J. 729 (1961).

17. Surely the Board's function involves that much. Cf. National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).
 Assuming as the Board found that Struksnes here had acted in complete good faith, he nevertheless found himself charged and subjected to hearing and a possible adverse ruling. On the other hand, neither he nor the Union could know—*nor could the Trial Examiner*— what result might flow from use of the questioned poll. In National Labor Relations Board v. Burnup & Sims, Inc., 379 U.S. 21, 22, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), the Court observed that, on the record before it, § 8(a) (1) had been violated "whatever the employer's motive."
 Rule-making in this area, it would seem, might have obviated the difficulty here as in many of the cases with which the Board says it has been "continually confronted." Certainly the Board has rule-making authority as the Act expressly provides. 29 U.S.C. § 156 (1964).

sideration not inconsistent with this opinion.[18]

Reversed and remanded.

EDGERTON, Senior Circuit Judge (dissenting):

The National Labor Relations Act provides in § 10(f), 29 U.S.C. § 160(f), that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall * * * be conclusive." The Board is "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect"; a court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). A court is not to overrule the Board's rejection of a claim unless "the evidence *required* the Board to uphold the claim." Amalgamated Clothing Workers of America v. National Labor Relations Board, 118 U.S.App.D.C. 191, 334 F.2d 581 (1964) (Emphasis added.).

The Supreme Court has established the principle that " 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287 [54 S.Ct. 692, 693, 694, 78 L.Ed. 1260] * * *" Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). We have recognized that this principle applies when we review action of the National Labor Relations Board. In Internat'l Woodworkers of America, Local Unions 6–7 and 6–122 v. National Labor Relations

Board, 105 U.S.App.D.C. 37, 39, 263 F.2d 483, 485 (1959), we said: "On the record as a whole, we are unable to say this finding has no rational basis and it must therefore be affirmed."

In the present case, the Board found that the employer's "purpose for conducting the poll was * * * to ascertain whether the Union represented a current majority"; that "there is not other evidence of animus"; and that the "polling of the employees under the circumstances of this case did not carry an implied threat of reprisals or in any other way interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 of the Act." The Board accordingly found that the General Counsel "failed to establish a violation of Section 8(a) (5) and (1) * * *." No doubt the Board might reasonably have found what my colleagues think it ought to have found. But if, as I think, the Board made a rational choice between two conflicting views neither of which is demonstrably right or demonstrably wrong, we should affirm.

Regarding the § 8(a) (1) charge of an unfair labor practice, the coercion of employees, the court does not decide what I think is the question before us. Instead of deciding whether the Board's finding is or is not supported by "substantial evidence on the record considered as a whole", or whether there is or is not "a rational basis for the conclusions approved by the Administrative body", the court decides only that it disagrees with the Board: "We are by no means satisfied with the Board's ad hoc acquiescence in, if not approval of, the manner in which the Employer polled his men." (p. 854). The court considers as an original question, without regard to the Board's conclusions, whether or not the taking of the poll was an unfair labor practice.

I think the court errs, also, in remanding the case to the Board "for further

18. Perhaps the full Board will decide to consider the case as it did in Cannon Electric Co. and Charles H. Warren, *supra* note 13.

consideration * * * ". If there was no rational basis for the Board's order, it should be set aside and the case should be remanded to the Board with a direction to find that the manner in which the employer polled the men was coercive. If, as I think, there was a rational basis for the Board's order, it should be affirmed. There is no occasion to ask the Board to give the case "further consideration".