**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**HARRY F. BERGGREN & SONS, INC.,
Respondent.**

**No. 19241.**

United States Court of Appeals
Eighth Circuit.

Jan. 24, 1969.

240

David C. Nevins, Atty. N.L.R.B., Washington, D. C., for petitioner; Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel and Elliott Moore, Atty., N.L.R.B., on the brief.

John E. Tate, of Nelson, Harding, Leonard & Tate, Lincoln, Neb., for respondent; Thomas B. Thomsen, Lincoln, Neb., on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order issued against Harry F. Berggren & Sons,

Inc. (Company) on June 14, 1967, pursuant to § 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e). The Board, in a decision reported at 165 N.L.R.B. No. 52, found that the Company violated § 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1), by polling employees as to their union sentiments, and § 8(a) (3) and (1) of the Act, 29 U.S.C. § 158(a) (3), (1), by discharging five employees to discourage union membership. There is no question of jurisdiction.

We hold that substantial evidence on the whole record supports the Board's findings, and enforcement of the Board's order is granted.

The Company is a Nebraska corporation with its principal place of business at Scottsbluff, Nebraska, and is engaged in general contracting consisting mainly of paving municipal streets. Laborer's Local Union 880, AFL-CIO (Union) began organizing the Company's laborers during the summer of 1966, and on July 23, the Company president Jerry Berggren was given a copy of the Union's standard agreement for the area calling for higher wages than those paid by the Company. About two weeks after receiving a copy of the agreement, Berggren made arrangements to conduct a poll of his employees, about 35 in number, to determine union sentiment. The Reverend Clyde E. Whitney, an Episcopal minister, supervised the polling, which was done by secret ballot on August 15,[1] at the Company's office. Before the balloting began, Berggren spoke to the employees.

According to Reverend Whitney, Berggren, speaking from notes, told of the founding and history of the Company; said that any dissatisfied employee could come to him; and, "The question is, do you men want to be represented by a union or don't you." Reverend Whitney recalled Berggren talked about "contractors' business", but Reverend Whitney did not pay close attention to that portion of the speech. According to employee Joseph Perez, Berggren stated that those engaged in a recent airline strike would take two to three years making up what they lost in the strike; the Company had never been picketed nor lost a day's work; it would be a hard time for the employees to strike; and that he was going to conduct an election to see whether the employees wanted to be represented by a union.

Following the speech Berggren left the premises and Reverend Whitney proceeded by selecting employees to distribute and count the ballots. The form and results of the election were notarized. After counting, the ballots were sealed inside the ballot box which was left on the premises. Only seven out of approximately 35 employees polled expressed a preference for union representation. The following day, Berggren filed a representation election petition with the Board's Regional Office.

Despite the result of the poll, the Union continued soliciting employees. From August 22–27, business representative J. D. Simmons and organizer David Bonilla distributed literature and authorization cards to nine employees who were working on a street near St. Mary's Hospital. On August 26, Bonilla was told by a Company foreman, Claude Richards, in a firm but friendly manner to get off the jobsite and confine solicitations to nonworking time. During this period four employees signed authorization cards and returned them to Simmons at the site.

On Saturday, August 27, Simmons went to the St. Mary's jobsite about 11:30 a. m. and waited around Richard's pickup truck for the crew to finish work. The general practice of the Company was to continue work through Saturday afternoon, but occasionally employees were allowed to leave early when the work for the day was completed. On this Saturday, employees Joseph Perez, Pedro Rodriguez, Tiofilo Ramirez and Isidro Rodriguez testified they asked Richards for the afternoon off and

---

1. All references to dates are to 1966 unless otherwise noted.

Richards agreed. Tony Lopez said that he was allowed to leave early as the work for that day was going to be completed by noon and no concrete is ever delivered to a job except during the morning on Saturdays.[2]

Foreman Richards' testimony was that Isidro Rodriguez and Tony Lopez, "spokesmen for the other fellows", said they were quitting with Richards responding, "Well, I can't hold you, that's your business." The six employees then put down their tools and walked off the job. It is undisputed that the employees signed out on their timecards which were kept in Richards' pickup, and that Richards did not make any kind of notation on the timecards about the employees quitting or walking off the job, but he did initial the timecards as was the usual practice. Art Olson, the Company office manager, testified Richards called him around 1:00 p. m. and said six men had walked off the job and wanted to know if any help were available. Olson replied that to his knowledge there was not.

Richards' version is that at the time the men left there was a great amount of work remaining to be done as 300 feet of concrete had been dumped in the forms and needed finishing.[3] A total of 500 feet of concrete had been poured Saturday morning, and it had taken a crew of eight men the morning hours to finish 200 feet. Richards claimed that he and two remaining laborers finished the remaining 300 feet in about two and one-half hours that afternoon. Richards did not indicate that he made any request of the men who left to stay and help with the unfinished concrete.

When the employees who did not work Saturday afternoon reported for work on the following Monday morning, they were told they had quit on Saturday and were no longer working for the Company. Four of the men sought to discuss their terminations with Berggren, but were not afforded an opportunity to talk with him. The employees received their final paychecks on the following Saturday, which was Company policy with regard to employees who quit, whereas discharged employees were paid within three hours of termination.

■ The National Labor Relations Board recently reviewed the standards applicable to determining the legality of polls.[4] In Struksnes Construction Co.,

2. A sixth employee mentioned in the complaint, Julio Villanueva, did not appear at the Board's hearing; no evidence pertaining to his leaving early was offered.

3. Unfinished concrete must be troweled, edged and grooved, checked for high and low spots with water, re-edged and re-grooved, broomed, and sprayed with curing compound.

4. The original position of the Board was that management's polling of employees violated § 8(a) (1) of the Act by interfering with employees exercising their rights under § 7 of the Act. "We again affirm the position the Board has consistently taken that Section 8(a) (1) of the Act is violated when an employer interrogates his employees concerning any aspect of union activity." Standard-Coosa-Thatcher Company, 85 N.L.R.B. 1358, 1359–1360 (1949). This rigid approach was rejected in holdings by various Courts of Appeals, including the Eighth Circuit. See, N. L. R. B. v. Protein Blenders, 215 F.2d 749, 750 (8 Cir. 1954) and cases cited.

In Blue Flash Express, Inc., 109 N.L.R.B. 591, 593 (1954), the Board overruled Standard-Coosa-Thatcher and the line of cases holding that interrogation per se is unlawful, and enunciated a new test: "[W]hether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act." See, N. L. R. B. v. Louisiana Manufacturing Company, 374 F.2d 696, 700 (8 Cir. 1967) and cases cited.

A revision of the Blue Flash test was precipitated by International Union of Operating Engineers, Local 49, AFL-CIO v. N. L. R. B., 122 U.S.App.D.C. 314, 353 F.2d 852 (1965), where the Court called upon the Board to reconcile Blue Flash with its findings in Johnnie's Poultry Co., 146 N.L.R.B. 770, enforcement denied N. L. R. B. v. Johnnie's Poultry Co., 344 F.2d 617 (8 Cir. 1965), and Lorben Corporation, 146 N.L.R.B. 1507, enforcement denied N. L. R. B. v. Lorben Corp., 345 F.2d 346 (2 Cir. 1965).

165 N.L.R.B. No. 102, 65 L.R.R.M. 1385, 1386 (1967), the Board, in response to a remand from the District of Columbia Circuit, stated, the considerations on which polling issues will be resolved by the Board in future cases;

"Absent unusual circumstances, the polling of employees by an employer will be violative of Section 8(a) (1) of the Act unless the following safeguards are observed: (1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) this purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere."

The Board contends that in the instant case the poll served no legitimate purpose since at the time of the poll the Union had not sought recognition, and immediately after the vote against the Union had been secured Berggren sought a Board election. The Board argues the poll was conducted against a backdrop of hostility toward the Union as evidenced by the pre-poll expression of views in opposition to unionization by Berggren; and no assurances were given that there would be no reprisals against the employees. In addition, the Board claims that knowledge gained from the poll— seven employees voted in favor of the Union—was followed by the discriminatory discharge of five suspected union supporters, a circumstance from which it could be inferred that future interrogation might be coercive.

On the record before us, the poll was conducted with integrity and served a legitimate purpose. There is no claim that the procedure utilized by Reverend Whitney in the balloting and counting was tainted by Company influence. Berggren announced the purpose of the poll was to determine whether employees favored the Union or not. It was proper for the Company, after being presented with the contract, to ascertain the strength of union sentiment among the employees.[5] The Board's contention that the improper purpose of the poll is demonstrated by Berggren's asking for a Board election is not well taken, and Serv-Air, Inc. v. N.L.R.B., 395 F.2d 557 (10 Cir. 1968), cert. denied, 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968), cited in support does not strengthen the Board's position. In *Serv-Air, Inc.*, the company, through its supervisors, engaged in the circulation of an election petition " * * * against a background of animus against the Union and a variety of unfair labor practices." The Court declined to " * * * permit the Company to profit by its improper actions." 564 of 395 F.2d. Here there has been no showing of unfair labor practices at the time of the poll.

Berggren's remarks at the outset of the balloting did not create an atmosphere of coercion. Section 8(c) of the Act, 29 U.S.C. § 158(c),[6] accords management the right to free expression within certain limits. As noted in N.L.R.B. v. Grand Foundries, Inc., 362 F.2d 702, 708 (8 Cir. 1966):

"Each side is accorded the right of persuasion and denied the use of

5. No representation election was pending so as to be violative of the outright proscription in *Struksnes* of taking a poll during an election campaign. As stated in *Struksnes* at 1387 of 65 L.R.R.M.:
 "On the other hand, a poll taken while a petition for a Board election is pending does not, in our view, serve any legitimate interest of the employer that would not be better served by the forthcoming Board election. In accord with long-established Board policy, therefore, such polls will continue to be

found violative of Section 8(a) (1) of the Act."

6. Section 8(c) of the Act reads:
 "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

coercion. Management may express an anti-union animus as well as the union expressing an anti-management animus, neither constituting an unfair labor practice. (Citations omitted.)

"However, in discussing the issue with employees no threat of reprisal or force or promise of benefit may be used or applied by management.

\* \* \* \* \* \*

"Inquiries to employees about their union feelings, even arguments and reasoning with employees on the merits of unions are permissible \* \* \*."

Berggren's speech indicated that he did not favor the Union, and Company employees should consider the difficulties that would be encountered in a strike over wages. We believe Berggren did not exceed the bounds of permissible persuasion nor did he enter into the prohibited area of coercion.

■ The alleged discriminatory discharge of the five suspected Union supporters likewise does not point to the existence of a coercive atmosphere at the time of the polling. The alleged discharges came some two weeks after the polling and no connection, save suspicion, is shown between the events.

■ In sum, the poll was conducted in a non-coercive atmosphere by secret ballot for a permissible purpose, which purpose was communicated to employees. However, no assurances against reprisals were given by the Company or its representatives at the time of the balloting. The Company argues that the lack of a coercive atmosphere coupled with the secret ballot procedure sufficed to satisfy this criterion of the text enumerated in *Struksnes*. We disagree.

The five "safeguards" set forth in *Struksnes* are soundly based in an attempt to balance the right of management to communicate with its employees and the employees statutory right to be free from interference, restraint and coercion in engaging in organizational activity. As noted in *Struksnes* at 1386–1387 of 65 L.R.R.M.:

"The requirement that the lawful purpose be communicated to the employees, along with assurance against reprisal, is designed to allay any fear of discrimination which might otherwise arise from the polling, and any tendency to interfere with employees' Section 7 rights. Secrecy of the ballot will give further assurance that reprisals cannot be taken against employees because the views of each individual will not be known. And the absence of employer unfair labor practices or other conduct creating a coercive atmosphere will serve as a further warranty to the employees that the poll does not have some unlawful object, contrary to the lawful purpose stated by the employer."

The polling of employees by management is an area that has been and continues to be closely circumscribed by the Board,[7] as interrogation by polling offers the opportunity for unlawful abuse of employees' rights under the Act. It is to counter the adverse effects that polling has on employees exercising their rights, that the Board in its expertise has fashioned the criteria set forth in *Struksnes*. The adverse effects that follow polling and reasons for the Board's long-standing concern are best stated by the dissenting Board members in *Blue Flash*. While we do not agree with the dissent that polling *per se* is an unfair labor practice, the dissent identifies the dangers that must be neutralized if employees' rights are to be protected. As stated by the dissenting Board members in *Blue Flash* at 596–597 of 109 N.L.R.B.:

"When an employer inquires into organizational activity whether by espionage, surveillance, polling, or direct questioning, he invades the privacy in which employees are entitled to exercise the rights given them by the Act. When he questions an employee about Union organization or any concerted

7. See n. 4.

activities he forces the employee to take a stand on such issues whether or not the employee desires to take a position or has had full opportunity to consider the various arguments offered on the subject. * * * Moreover, employer interrogation tends to implant in the mind of the employee the apprehension that the employer is seeking information in order to affect his job security and the fear that economic reprisal will follow the questioning. * * * Interrogation thus serves as an implied threat or a warning to employees of the adverse consequences of organization and dissuades them from participating in concerted activity. It thereby undermines the bargaining agent chosen by the employees, thwarts self-organization, and frustrates employee attempts to bargain collectively."

These adverse effects can follow interrogation regardless of the employer's motive.[8] Thus, if employees' rights are not to be subject to derogation by the right of management to poll employees for a legitimate purpose, all of the safeguards enunciated in *Struksnes* should be observed.[9] Since employees in the case at bar were not given affirmative assurances that no reprisals would follow their voting in favor of the Union, the Board's finding that the Company violated § 8(a) (1) of the Act by polling employees as to their union sentiments must be enforced. See, N.L.R.B. v. Heck's, Inc., 387 F.2d 65 (4 Cir. 1967).

With regard to the alleged discriminatory discharge issue, the observation of this Court in N.L.R.B. v. Twin Table & Furniture Co., 308 F.2d 686 (8 Cir. 1962) is appropriate:

"Unless a controversy between the National Labor Relations Board and an employer as to the enforceability of an order of the Board resulting from conventional proceedings before it, presents some novel or unusual problem, a detailed discussion of the facts and the law is ordinarily profitless".

The pertinent facts here may be summarized briefly. Despite the result of the poll, the Union continued in its efforts to organize Company employees. Union representatives distributed literature and authorization cards to employees working at the St. Mary's jobsite; four employees signed cards and returned them to Union representative Simmons at the site. The Company foreman, Richards, was aware of the Union's activity, having been handed one of the cards and having expressed disapproval of solicitation during working hours. Company president Berggren had expressed himself as being opposed to unionization of his employees. On the Saturday in question, Simmons was at the jobsite.

 The factual dispute centers on whether the employees walked off the job or had foreman Richards' permission for taking the afternoon off. The evidence supports the Board's resolution of this issue. Richards signed the employees' timecards without any notation that the employees quit or were terminated, and

8. Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 106 (1964).

9. In N. L. R. B. v. Larry Faul Oldsmobile Co., 316 F.2d 595 (7 Cir. 1963), interrogations of employees to ascertain whether or not they had joined the union were held not violative of the Act merely because such interrogation was not accompanied by assurances to employees they would suffer no reprisals because of the response given. The Court held at 598 of 316 F.2d: "The failure to give such assurances * * * is one of the circumstances to be considered but not to the exclusion of all others." The case is distinguishable in that it does not deal with interrogation by systematic polling, but with three isolated instances of informal questioning. The holding is compatible with the teaching of *Blue Flash* ("all the circumstances"). We express no opinion on the holding in *Larry Faul Oldsmobile,* since we confine our holding herein to a systematic polling situation which must be compared to the test set forth in *Struksnes.*

the employees appeared for work as usual the following Monday morning. Neither action is consistent with their having quit, and no explanation is offered why these employees, two of whom had worked for the Company for substantial periods, would quit jobs which promised several more weeks of work, when all were unskilled laborers unlikely to find better jobs. Richards' version, that the men walked off the job with 300 feet of concrete in need of finishing, seems incredible. Richards admittedly did not ask the men to remain and help out, a request which Richards would be expected to make if he faced such a critical situation. His claim that he and two men finished 300 feet of concrete on Saturday afternoon, whereas a crew of eight men had finished only 200 feet Saturday morning seems somewhat strained. The Board was justified in rejecting Richards' explanation of what happened and, with it, the Company's attempted explanation for termination of the employees.

 However, rejection of the Company's explanation for the discharges, without more, does not mean that the Board has fulfilled its burden of proving discriminatory discharges within the meaning of § 8(a) (3). Basic principles are well stated in N.L.R.B. v. South Rambler Company, 324 F.2d 447, 449–450 (8 Cir. 1963):

"Certainly, an employer may hire and discharge at will, so long as his action is not based on opposition to union activities. (Citations omitted.) Furthermore, an employer's general hostility to unions, without more, does not supply an unlawful motive as to a specific discharge. (Citations omitted.) An inference that a discharge of an employee was motivated by his union activity must be based upon evidence, direct or circumstantial, not upon mere suspicion." (Citations omitted.)

However, we also take cognizance of the scope of this Court's review in this type of case, and we recognize that this case does not present a unique question for determination. As aptly phrased in N.L.R.B. v. Council Manufacturing Corporation, 334 F.2d 161, 164 (8 Cir. 1964):

"But this court has also observed that coincidence in union activity and discharge renders an employer vulnerable and serves to make the discharge issue one of fact. (Citations omitted.) * * * [W]e have noted the difficulty and sensitivity of a coincidence of this kind, the choice which then confronts the trier of fact, and the necessary result that, if the fact trier's determination is supported by an adequate evidentiary basis, this court cannot retry the suit." (Citations omitted.)

 On the basis of Berggren's anti-union animus, the coincidence in time between the terminations and the union activity,[10] the unusual circumstance that the employees asked for the afternoon off at a time of heightened union activity in the presence of the Union's business representative, and the employees reporting for work the follow-

---

10. The Company points to a recent decision of this Court in Broadway Motors Ford, Inc. v. N. L. R. B., 395 F.2d 337 (1968), where an alleged § 8(a) (3) violation was denied enforcement, the Court quoting the well established principle that " * * * mere coincidence of an employee's union activity and the employee's discharge will not support a charge of discrimination." 340 of 395 F. 2d. The Company deems *Broadway Motors* as "extremely analogous to the occurrences of our case." A reading of the case does not support this analysis. In *Broad-* *way Motors*, the employee admittedly had committed acts of insubordination and unbecoming conduct which had marked him for discharge long before he was linked to any union activity, and no anti-union animus of any kind was shown. The only evidence supporting discriminatory discharge was the timing of the discharge—the employee had attended a union informational meeting on a Sunday and was terminated on the following Tuesday. *Broadway Motors* is clearly distinguishable on its facts.

ing Monday, the Board was justified in finding that the Company suspected the five employees of union activity or union sympathy and discharged them in violation of § 8(a) (3) and (1) of the Act.

Enforcement granted.

BLACKMUN, Circuit Judge, dissenting in part.

I am troubled by, and dissent from, the court's enforcement of that portion of the Board's order relating to a § 8(a) (1) violation in the polling of the employees. In so doing I am not to be understood as disapproving of the conditions which Strucksnes Constr. Co., 165 NLRB No. 102 (1967), imposes. It merely seems to me that we can view too stringently and too formally the third requirement relating to assurances against reprisal. Certainly the actual utterance of words of assurance, spoken or written, but hollow, would be no genuine assurance at all, and, just as certainly, ought not then to satisfy the third requirement. In contrast, I feel that the satisfaction of the assurance requirement is to be found in the totality of the circumstances. The four other requirements of *Struksnes,* the majority holds, are all clearly satisfied here. I agree. However, with those four requirements so satisfied; with the poll fairly and carefully conducted; with the person in sole charge of that poll a man who was concededly neutral, who was well respected in the community, and (as he testified for the general counsel) who knew most of the employees by name; with Mr. Berggren not a member of Mr. Whitney's parish; with three employees selected by Mr. Whitney distributing and counting the ballots; and with the poll taken with no management or supervisory personnel present, I am convinced, as was one member of the Board's panel, that assurances against reprisal are inherent and present in the very situation. To require, as a condition of avoiding being guilty of an unfair labor practice, that Mr. Berggren or Mr. Whitney specifically announce, in so many words, that the employees are then and there assured that there will

be no reprisals, is for me somewhat unrealistic. NLRB v. Heck's Inc., 387 F.2d 65 (4 Cir. 1967), the case primarily urged upon us by the Board on this issue, provides no factual precedent. It appears, from that opinion, that the poll there was conducted by company representatives and that the answers were given to company interrogators.

On the discharge issue I am in agreement with the majority.