**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MILLER TRUCKING SERVICE, INC., and/or Miller Trucking Service, Inc., a Subsidiary of Tulsa Crude Oil Purchasing Company, Respondent.**

**No. 286–70.**

United States Court of Appeals, Tenth Circuit.

July 23, 1971.

Rehearing Denied Sept. 17, 1971.

Michael Levin, Chicago, Ill., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., National Labor Relations Board, on the brief), for petitioner.

William G. Haynes, Topeka, Kan., Eidson, Lewis, Porter & Haynes, Topeka, Kan., on the brief, for respondent.

Before BREITENSTEIN and HILL, Circuit Judges, and LANGLEY, District Judge.

BREITENSTEIN, Circuit Judge.

Efforts by the employees of a small Kansas trucking company to secure union representation have produced some large problems. The National Labor Relations Board has petitioned for the enforcement of its decision and order wherein it held that respondent Miller Trucking Service, Inc., had violated § 8(a) (1) and (5) of the National Labor Relations Act as amended. 29 U.S.C. § 158(a) (1) and (5). The decision and order of the Board are reported at 176 NLRB No. 76. The Company resists enforcement on a variety of grounds.

The Company, a Kansas corporation, was engaged in the intrastate transportation of petroleum products for a number of oil companies, including Derby Refinery Company. It had its principal place of business in Hays, Kansas, and employed nine drivers and one mechanic.

Employee Mader secured from Glenn, a business agent for Local 696 of the Teamsters Union, a number of authorization cards which he distributed among other employees. Eight cards were signed and returned to Glenn who thereafter met with seven of the eight signers. On May 19, 1967, Glenn wrote Hilary Miller, the president of the Company, that the Union represented a majority of the employees for the purpose of collective bargaining and stated his readiness to meet with the Company. The subsequent discussions among Hilary Miller and some of the employees will be mentioned in detail later.

Hilary Miller owned or controlled all of the Company stock. Late in 1966, his doctor advised him to slow up and he approached a number of people regarding the sale of the Company. On May 24, 1967, after he had received the Union demand, he began negotiating with Tulsa Crude Oil Purchasing Company for the sale of the Company. The Union filed a petition for a certificate of representation with the Board's regional director in Kansas City, Missouri. The Company received notice on June 1 of a representation hearing to be held on June 15. On June 10, Hilary Miller and Tulsa executed an agreement for the sale of all Company stock to Tulsa. The Company notified the regional director of the sale agreement and moved that the representation hearing be dismissed. The regional director denied the motion but continued the hearing to June 29.

On June 17, Hilary Miller discharged all of the Company employees, explaining that he had sold his interest and giving them one week's severance pay. On the same day the employees were introduced to representatives of Tulsa, received job application forms, and were given written and driving examinations. Six were rehired and four, all of whom had signed Union authorization cards, were not rehired. On June 19, Hilary Miller and his wife transferred all of the Company stock to Tulsa. Under the Tulsa ownership, the Company operated in substantially the same fashion as it had previously, using the same equipment and servicing the same customers.

The Union filed unfair labor practice charges on June 22 against both the Company and Tulsa. The regional director then postponed indefinitely the representation hearing. Later the representation petition was withdrawn and an amended charge was filed against the Company and against the Company as a subsidiary of Tulsa.

After a hearing of the unfair labor practice charges, the trial examiner overruled the Company's objections to Board jurisdiction. On the theory that Hilary Miller was replaced as employer by Tulsa upon the transfer of the stock, he recommended that the complaint be dismissed in its entirety. On the General Counsel's exceptions to the examiner's decision the Board held that "mere change of stock ownership does not absolve a continuing corporation of responsibility under the Act." The Board held that the Company had violated § 8(a)(1) and (5) by interrogation of employees concerning their protected activities and by refusing to recognize or bargain collectively with the Union. It also held that the Company had violated § 8(a)(1) and (5) by unilaterally terminating its employees.

The first problem is jurisdiction. The Company operates only in Kansas. Part of its business is the transportation of crude oil from the tanks of producers to refineries. The general manager of Derby Refinery testified that Derby paid the producers the posted price less the transportation charge and remitted the transportation charges directly to the Company. In 1967, the Company received about $60,000 from Derby Refinery for hauling crude oil from Kansas production sites to Derby's Kansas refineries. Since then, it has continued to earn about $5,000 a month for such services. The Derby manager testified that during the year in question Derby bought at least $4,000,000 worth of crude oil from without Kansas.

This testimony was objected to by the Company. The examiner held that the manager was competent to testify and gave the Company an opportunity, which it did not use, to impeach his testimony. In our opinion the testimony was properly received.

■ The Company argues that it does not come within the Board's self-imposed jurisdictional standards. See National Labor Relations Board v. Marbro Food Service, Inc., 10 Cir., 366 F.2d 477, 478, cert. denied 386 U.S. 912, 87 S.Ct. 862, 17 L.Ed.2d 785, and cases cited in n. 4. The theory is that the transportation service was furnished for the oil producers rather than for Derby and, hence, the record shows no more than local cartage with a de minimis effect on interstate commerce. We are not persuaded. Derby paid the Company about $60,000 annually for such services. Derby purchased about $4,000,000 worth of oil annually from without Kansas. The Company met the Board's indirect outflow standard by furnishing services valued at more than $50,000 annually to Derby which purchased over $50,000 in goods annually from outside of Kansas. Ibid. The Company functions as an essential link in the transportation of petroleum and performs its service for a buyer which is engaged in interstate commerce. The Board was well within its discretion in exercising jurisdiction over the Company.

■ The next problem relates to the sale by Hilary Miller of all of the stock in the Company to Tulsa. We have no question of going out of business, see Textile Workers Union of America v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed. 2d 827, or of successorship, see Perma Vinyl Corporation, 164 NLRB 968, enforced, United States Pipe and Foundry Co. v. National Labor Relations Board, 5 Cir., 398 F.2d 544. The employing entity at all times was Miller Trucking Service, Inc. The transfer of the corporate stock from Hilary Miller to Tulsa did not change the corporate entity. We agree with the Board that the corporate entity will sometimes be pierced when it is used to evade legal responsibility, but it will not be pierced to protect it against its own wrongdoing. Whatever unfair labor practices might have occurred they were not the result of the sale of the stock but of managerial actions.

The claimed unfair labor practices are (1) improper interrogation of employees, (2) threat of reprisal to one employee, (3) discharge of employees, and (4) failure to bargain. These must be considered both separately and together.

The interrogation of employees by Hilary Miller took place after his receipt of the Union demand. He brought it into the Company shop, read it to four employees, and asked employee Rogers if he knew anything about it. Rogers replied that he had been to a Union meeting. Miller asked if he had signed a card and Rogers replied, "We did." Miller said, "That's all I need to know," and left. Two days later, Miller asked employee Wagner if he knew anything "about the deal." Wagner assumed that Miller referred to the Union and said that he had been approached. Nothing more was said and the matter was dropped. The third incident related to three days' vacation pay for employee Mader. In the course of the discussion Miller said, "If you guys want the God damn union to run you and tell you what to do, it looks like they are going to write your paychecks." Mader asked what that had to do with it and Miller replied, "A lot."

■ The record shows interrogations. It does not show a poll. Interrogations are not illegal per se in the absence of coercion, threat, or restraint. National Labor Relations Board v. Gold Spot Dairy, Inc., 10 Cir., 417 F.2d 761, 762. The inquiries by Hilary Miller served a legitimate purpose but were objectionable because the purpose was not communicated and no assurance against reprisals was given. See National Labor Relations Board v. Camco,

Incorporated, 5 Cir., 340 F.2d 803, 804–805, cert. denied 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339; contra, National Labor Relations Board v. Lorben Corporation, 2 Cir., 345 F.2d 346, 347–348; see also International Union of Operating Engineers, Local 49, AFL–CIO v. National Labor Relations Board, 122 U. S.App.D.C. 314, 353 F.2d 852, 856, n. 16. The question whether a particular interrogation is proscribed lies primarily within the responsibility of the Board and we will not disturb its decision unless it is unsupported by substantial evidence. National Labor Relations Board v. Thompson Transport Company, 10 Cir., 406 F.2d 698, 702.

Pursuant to his agreement with Tulsa for the transfer of the stock, Hilary Miller terminated all ten of the employees of the Company. Four were not rehired when Tulsa took over the management of the Company. The Board held, and we agree, that the discharge of the four who were not rehired was motivated by nondiscriminatory business reasons and not by anti-union considerations, and did not violate § 8(a) (1) and (3).

■ The next problem is the duty of the Company to bargain with the Union. Authorization cards, although inferior to the election process, can adequately reflect employee sentiment. In the instant case the cards were clear and unambiguous. The Company's attack on the cards and on the procurement of signatures is so insubstantial as to merit no consideration.

In National Labor Relations Board v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the Court sustained the Board's remedial authority to issue a bargaining order where the union has established its majority through authorization cards and unfair labor practices have been committed that interfere with the election processes and tend to preclude the holding of a fair election. The Court said that a bargaining order would be appropriate in two situations: (1) where the employer's unfair labor practices are so pervasive and coercive that a bargaining order is the only effective remedy, and (2) "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." Ibid. at 614, 89 S.Ct. at 1940. The Court recognized a "third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." Ibid. at 615, 89 S.Ct. at 1940.

This brings us back to the claimed unfair labor practices. They involve (1) the interrogation of five out of the ten employees with no communication of the purpose of the interrogation and no assurance against reprisals, (2) the threat of a reprisal in regard to three days' vacation pay for one employee, and (3) the discharge of the employees upon the stock transfer and the failure to rehire four out of the ten. The Board itself eliminated (3) on the ground of legitimate business purpose. This leaves us with (1) and (2). The Board held that their cumulative impact "on the employees' ability to continue to freely exercise their Section 7 rights is surely substantial under these circumstances." With full recognition of the expertise and wide discretion of the Board, we doubt the validity of the conclusion.

■ At the very most this case falls within the second category of Gissel where "the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." Ibid. at 614, 89 S.Ct. at 1940; see also National Labor Relations Board v. Wylie Manufacturing Company, 10 Cir., 417 F.2d 192, 196, cert. denied 397 U.S. 913, 90 S.Ct. 915, 25 L.Ed.2d 94. The Board made no specific findings in this regard. We believe that the need for such findings is particularly

important in a case such as this. Hilary Miller was an officer of the Company which is responsible for his actions. However, the ownership and management of the Company has changed and the important consideration is "the possibility of erasing the effects of past practices and of ensuring a fair election * * * by the use of traditional remedies." Ibid. We are unwilling to accept the Board's generalizations in the absence of the findings which we believe Gissel requires.

The Board ordered the reinstatement of the four employees who were not rehired when Tulsa took over the management of the Company. We are unable to reconcile this holding with the Board's decision that the discharges were for nondiscriminatory business reasons. In that regard the Board said: "A new management was preparing to operate the business, and new managers often desire, for reasons unrelated to union activities, to start afresh, with employees of their own choosing." It would seem to us that if the discharges were proper so also was the failure to rehire some of the former employees.

■ The Board seeks to justify its action on the grounds that the subject of mass terminations, the timing thereof, and the rights of the employees with respect to rehiring were proper subjects for bargaining with the Union. This is not a case where the Company went out of business and had the duty to bargain as to the effects of the closing. See National Labor Relations Board v. Thompson Transport Company, 10 Cir., 406 F. 2d 698, 703. Instead, this is a case where the terminations were rightful and for valid business reasons. There was no contract which would preclude termination for such reasons. We fail to perceive how a valid termination can be followed by an invalid failure to rehire. In our opinion the record does not sustain the reinstatement order.

Enforcement is denied.