387 F.2d 751
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Eugene YOKELL and Bernard Yokell, Co-Partners, d/b/a Crescent Art Linen Co., and Betsy Ross Needlework, Inc., New York, N. Y., Respondents.
 No. 59.
 Docket 31114.
 United States Court of Appeals Second Circuit.
 Argued October 2, 1967.
 Decided December 4, 1967.
 
 COPYRIGHT MATERIAL OMITTED Alan Eisenberg, Atty., N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, and Janet Kohn, N.L.R.B., Washington, D. C., on the brief), for petitioner.
 James Carroll, New York City (Reichbart & Reichbart, New York City, on the brief), for respondents.
 Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge.
 
 
 1
 The sole question presented on the Board's petition is whether findings that respondents engaged in unfair labor practices in the course of a union organization drive at their plant in 1965 are supported by "substantial evidence," Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and are therefore conclusive under § 10(e) of the Act.
 
 
 2
 Eugene and Bernard Yokell are partners, doing business as Crescent Art Linen Company, in the manufacture and sale of decorative linen products in New York City.[1] During the first week of April, 1965, the Retail, Wholesale and Department Store Union, AFL-CIO, Local 29 started a campaign to organize Crescent's employees. This was the first effort at unionization at respondents' place of business in twenty-five years. Shortly after the Union had launched its drive by distributing handbills to employees outside the building, Eugene spoke to the employees while they were gathered by their machines for lunch. He told them that he was aware that there were Union organizers around who were trying to get them to sign cards and he asked them "not to do anything, not to sign any cards, to have patience for a couple of days * * * until we find out something about this Union, and we will * * * have a meeting and talk things over." Eugene testified that several of the older employees had stated to him their opposition to the Union, and had suggested that he talk to them about what was happening.
 
 
 3
 On Friday, April 9, Eugene advised the employees that there would be a meeting right after work on the following Monday, and that he would supply sandwiches. When that time came the employees gathered near the center of the eighth floor work area where they were treated to sandwiches and liquid refreshment at respondents' expense. Except for a few who could not stay for the meeting, all of the workers were in attendance and, in addition, the group included the two Yokells, Eugene's daughter Joan, a clerical employee, Harold Binder, a supervisor, Al Azar, a salesman, and Yetta Siegal, a bookkeeper. Eugene explained to the employees that the purpose of the meeting was to conduct a poll to determine whether or not a majority of them wanted Union representation. "If they did," he later testified, "then we had nothing to talk about, because we would have to talk to the union. If they didn't, we could go on with the meeting and see what our problems were, if any." Eugene then presented each employee with a paper ballot with instructions to mark one of the two choices.[2] He explained that the poll was "not official," but only "for us to determine whether or not you want the union to talk for you, or whether you want to talk for yourselves." Someone asked if the ballots should be signed and Eugene answered, "No." Those who were not voting then withdrew about twenty yards while each employee marked his ballot, and dropped it into a corrugated box which had been provided for the purpose. Eugene then returned and asked that someone count the ballots and two of the employees volunteered. There were thirteen votes cast for the union, and twenty-three votes against.
 
 
 4
 For almost an hour thereafter Eugene discussed employment conditions with the group. He read and commented upon each of the benefits advertised in the Union's handbill, and tried to explain that it "wasn't as rosy as it sounded on paper." While some of the employees voiced their grievances, and made known their demands, Eugene noted requests and suggestions on a piece of paper.[3] He told them that he could not promise anything, but that he would listen, give it some thought, and see what could be done. When one employee inquired why no extra vacation had been granted the year before, Eugene explained that since he and Bernard had been willed the business by their father, they had been hard pressed to pay out certain cash shares to a sister and two brothers, but that the last payment had been made in February, 1965 and they could now afford to be "more liberal."
 
 
 5
 Friday, April 16, was Good Friday and, although the shop was open for those who wanted to work, only about eight employees chose to do so. That year, for the first time, respondents decided to grant Good Friday as a paid holiday and, although no announcement was made to that effect, the ensuing payroll included pay for that holiday. As the plant would be closed on Yom Kippur, it was also decided that that day should be a paid holiday for the Jewish employees.[4] On July 1, respondents announced that employees with five or more years of service with the company would receive an extra week of paid vacation, effective July 4, 1965; and about the middle of August, a general wage increase was granted which affected all employees.
 
 
 6
 We think the Board was justified in finding violations of § 8(a) (1) implicit in respondents' course of conduct. Although it appears that participation in the secret ballot was obtained on a voluntary basis, and that the polling procedure was fair,[5] the result, which was against the Union, could not be used as a justification for direct bargaining with the employees. We agree with the Board that the balloting here was not conducted for a proper purpose, but existed merely as a prelude to the illegal bargaining session which was to follow. Respondents do not claim that the poll was conducted in order to establish grounds for testing the validity of the Union's demand for recognition, although earlier that morning the Union had claimed a majority, and requested of Eugene that a contract be negotiated. Such a poll conducted by a neutral third party might well afford a useful test of grounds for a claimed good faith doubt concerning an asserted card-majority. In this case, we conclude there was sufficient in the record to support the Board's finding that the primary purpose of the meeting was to bargain with the employees as a means of warding off the Union, a violation of § 8(a) (1), NLRB v. Flomatic Corp., 347 F.2d 74, 76-77 (2 Cir. 1965); Edward Fields, Inc. v. NLRB, 325 F.2d 754, 760 (2 Cir. 1963); NLRB v. Philamon Labs., Inc., 298 F.2d 176, 180-181 (2 Cir.), cert. denied 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962), and that the polling was rightly condemned as an integral part of that unlawful course of conduct. NLRB v. Charles R. Krimm Lumber Co., 203 F.2d 194, 195 (2 Cir. 1953).
 
 
 7
 The Trial Examiner found that benefits granted to the employees in the form of an added holiday, extra vacation, and increased wages related to and substantially fulfilled, promises implicit in Eugene's conduct at the April 12 meeting. It is true that Eugene made no overt promises of benefit on that occasion, and that he in fact disclaimed the ability to do so. But this does not obscure the fact that his willingness to receive and consider employee requests at a time which coincided with the first union organization campaign at his plant in twenty-five years might well have indicated to the average employee that better conditions would be forthcoming, as in fact they were. Viewed in isolation the granting of an additional holiday on Good Friday might seem a de minimis violation of § 8(a) (1) and the same might be said for the extra vacation which was granted more than two months after the April meeting. But the Good Friday concession matched the holiday schedule advertised by the Union. It was discussed by Eugene at the meeting, and may have been designed to tempt employees with visions of what was to come in the future. Although Eugene testified that he had been talking with the employees about extra vacation on and off for the past two years, the Trial Examiner was not without justification in finding that his sudden generosity at election time was motivated by other considerations than the welfare of the employees.
 
 
 8
 Although the Board's case for enforcement regarding the August wage increases in borderline,[6] we grant enforcement in light of the Trial Examiner's finding that the purpose of the increases was to undermine the Union's support among the employees. See NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). In so doing, however, we are aware that, as a practical matter, union campaigns are often carried on over a period of weeks, sometimes months, and we emphasize that the granting of normal and regular increases in employee benefits are not to be held to be an unfair labor practice merely because a union drive is in progress, a result which would work to the detriment of the very people whom the Act seeks to protect.
 
 
 9
 This leaves only that portion of the Board's order which relates to threats of "plant removal or other reprisals." The record shows that during the meeting (or directly thereafter), Eugene told a group of employees that the lease on their building, which would expire on February 1, 1966, had not been renewed, and that it was possible that they might move. His subsequent testimony to the effect that there was a space problem at the plant during the busy season when extra workers had to be taken on, and that as such times there had been talk of moving to another location, does not explain why the prospect of moving was brought up in April, during the slack season, and in the context of a Union organizing campaign.
 
 
 10
 Under the circumstances we think that the Trial Examiner was justified in treating these statements as implied threats of reprisal, and therefore outside the protection of § 8(c) of the Act. See NLRB v. Cousins Associates, Inc., 283 F.2d 242, 243 (2 Cir. 1960). Statements likely to produce fear of retaliation are often hard to distinguish from innocuous prophecy regarding the economic effects of unionization and, in classifying a particular utterance, proper weight must be accorded to the First Amendment principles which underlie § 8 (c) of the Act. But one relevant factor in such a determination is whether the employer has the power to control the occurrence of the untoward events which are the subject of his communications. NLRB v. River Togs, 382 F.2d 198 (2 Cir. 1967). Clearly that was the case here. And since, in addition, there is no apparent economic cause-and-effect relationship between entry of the Union and the relocation of respondents' place of business, we think these statements might properly be interpreted, both in purpose and effect, as likely to instill fear in the employees that dire steps of retaliation would result from an authorization of the Union as their bargaining representative. See Irving Air Chute Co. v. NLRB, 350 F.2d 176, 178-179 (2 Cir. 1965); Edward Fields, Inc. v. NLRB, supra, 325 F.2d at 760; NLRB v. Cousins Associates, Inc., supra, 283 F.2d at 243; NLRB v. Somerset Classics, Inc., 193 F.2d 613, 614-615 (2 Cir.), cert. denied 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635 (1952).
 
 
 11
 While we therefore grant enforcement to that part of the order which refers to threats of plant removal, we are unwilling to go the further step of approving the additional words "or other reprisals."[7] There is danger that such a catch-all phrase might be interpreted as having reference to other statements found objectionable by the Trial Examiner, but not specifically mentioned in the order, which we view as protected by § 8 (c) of the Act. These statements include Eugene's opinion that if the Union got in and its demands were too high, he would have to raise prices and cut back production, as well as his reference to several firms which had been forced to go out of business after becoming involved with a particular union. Standing alone, these statements are clearly entitled to protection under § 8(c) and the First Amendment. See our recent opinion in NLRB v. Golub Corp., 388 F.2d 921 (2 Cir. 1967). We do not think the fact that they were uttered in conjunction with the few, minor § 8(a) (1) violations which we have here sustained is sufficient reason to strip them of the protection which that section was intended to provide, cf., NLRB v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941). The fact that such predictions of dire events are unwarranted, or less than fully substantiated when made, is not, in our opinion, itself enough for this purpose, so long as they are not advanced without any reasonable basis in fact. NLRB v. Golub Corp., supra.
 
 
 12
 Regarding Eugene Yokell's statement to the employees shortly after the beginning of the organizing campaign by the Union that the workers should not do anything and not sign any cards and have patience for a couple of days until they found out something about the Union and could meet and talk things over, we conclude that there was sufficient in the accompanying circumstances, particularly in connection with the meeting which followed, to call for enforcement. If a spectrum of varying conditions is considered, running from those quite clearly calculated to interfere with the employees' right to a free choice to those which are plainly no more than an expression by the employer of "views, argument or opinion" within § 8(c), we would hold that a simple direction by an employer to his employees not to sign a card would fall within the former as one designed to interfere with the employees' free choice. If, however, the employer asked the employees not to make a decision for a couple of days so that he could tell them his views and so that they could think the matter over, and he thereafter did talk to them but confined himself entirely to what was clearly permissible under § 8 (c) and without any violation of § 8(a) (1), then his initial request that they make no decision for a short time, including the signing of cards, should be held to be legitimate so long as its only purpose was to secure the opportunity to be heard. The evidence showed that the facts of the present case place it somewhere in between; and there was sufficient to justify the trial examiner and the Board in finding that the employer sought not only an opportunity to express his views and opinions but an effort to delay a possible decision for the union, while providing an occasion for direct bargaining with the employees where he displayed both the carrot and the stick to get them to reject the Union.
 
 
 13
 We are aware that the package of benefits which respondents assembled here is far less impressive than those in many of the decided cases. Compare NLRB v. Exchange Parts Co., supra; NLRB v. Philamon Labs., Inc., supra; NLRB v. Pyne Molding Corp., 226 F.2d 818 (2 Cir. 1955). But the decisive question in these cases is whether there is a substantial likelihood that the actions of the employer will interfere with the employees' right to choose their representatives freely. NLRB v. Exchange Parts Co., supra, 375 U.S. at 409, 84 S.Ct. 457; Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). While on the benefits issue, taken alone, this record might press the concept of "substantial evidence" too far, Universal Camera Corp. v. NLRB, supra, 340 U.S. at 477, 71 S.Ct. 456, the additional evidence of threats of reprisal satisfies us that, on the record considered as a whole, the Board's conclusions are not without substantial foundation.
 
 
 14
 The Board's order will be modified to accord with this opinion and, as so modified, enforcement is granted.
 
 
 
 Notes:
 
 
 [1]
 Betsy Ross Needlework, Inc., a New York Corporation of which Eugene is Treasurer, and Bernard is President, is operated with Crescent as a single integrated business enterprise under a common labor policy
 
 
 [2]
 The ballot form read:
 "I want a Union to represent me ......
 I do not want a Union to represent me ......"
 
 
 [3]
 One of the girls noted that most of the employees stayed home either on Yom Kippur or on Good Friday, and suggested that each of those days should be made a paid holiday for those who took one of them off. Eugene did not promise anything, but noted "Good Friday" on the scrap of paper. Some of the girls imquired about an increase in wages, which he also noted, as well as a request for a second week of vacation for five-year employees. In addition, Eugene's notes reflect a request that hospitalization benefits presently available only to those older workers who are "considered permanent," be made a "standing rule" after one year of service
 
 
 [4]
 For some years the plant had been open on Yom Kippur for non-Jewish employees. When, in recent years, circumstances required that the plant be closed on that day, these employees were permitted to earn a full eight hours' pay for the day missed by working five hours on the following Saturday. Although at one point Bernard testified that Jewish people had been paid for Yom Kippur in 1964, Eugene testified that neither day had been a paid holiday before 1965, when an additional holiday was granted to all employees, effective either on Good Friday or on Yom Kippur
 
 
 [5]
 The Trial Examiner's contrary finding on the issue of voluntariness is not supported by substantial evidence and we fail to see any danger in the polling procedures used here since the secret, unsigned ballot effectively preserved the voters' anonymity and eliminated any basis for individual reprisals. In this regard the present case is distinguishable from NLRB v. Lorben Corp., 345 F.2d 346 (2 Cir. 1965) and International Union of Operating Engineers, Local 49 AFL-CIO v. NLRB, 122 U.S.App.D.C. 314, 353 F.2d 852 (1965)
 
 
 [6]
 The August wage increases were in substantial part, substitutes for adjustments customarily made during March or April of the year, which were by-passed in 1965 because of the Union activities at respondents' plant. Eugene sought to explain why the August action was "across-the-board" by the fact that respondents had entered their busy season and could not then afford to spend the time required to review individual items and performances, as had previously been the practice. It does not appear that the August increases were greater in amount than those normally given on an individual basis in the past
 
 
 [7]
 We also modify the order to the extent it refers to the coercive interrogation of employees, of which there is no evidence in the record
 
 
 
 15
 HAYS, Circuit Judge (concurring in the result):
 
 
 16
 I concur in the result.
 
 
 17
 FRIENDLY, Circuit Judge (dissenting and concurring):
 
 
 18
 I could not at all agree that an employer who has learned that a union organizing campaign is in progress violates § 8 (a) (1) by asking employees not to sign cards "for a couple of days * * * until we find out something about this Union and we will * * * have a meeting and talk things over." The purpose of § 8 (a) (1) is to safeguard the employees' right, guaranteed by § 7, to decide for or against a union. It does not grant unions a protected period during which they can talk to employees while the employer cannot do so on an informed basis. If the employer remains silent until he has found "out something about this Union," what he is likely to find out is that the Union has already signed up a majority on the basis of representations as to probable achievements which he could lawfully have countered under the principles we have recognized in NLRB v. River Togs, Inc., 382 F.2d 198, 201 (2 Cir. 1967) and NLRB v. Golub Corp., 388 F.2d 921, 928 (2 Cir. 1967), and then it will be too late. I fail to perceive how an employer can be said to "interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7" when he politely asks them not to take action, possibly irrevocable for a long time, to make a union their representative until they have heard the other side. To the contrary, an employer's request for a reasonable opportunity to present "views, argument, or opinion" to his employees falls within the protection of § 8(c). In regulating election tactics the Board has frequently and properly stressed the importance of a right of reply to the effective exercise of § 7 rights, as, for example, in the "24-hour" rule of Peerless Plywood Co., 107 N.L.R.B. 427 (1953). See Bok, The Regulation of Campaign Tactics in Representations Elections under the NLRA, 78 Harv.L. Rev. 38, 91-106 (1964); such a right is no less vital when an employer is confronted with a card-signing campaign.
 
 
 19
 As I read Judge Anderson's opinion, we are not in disagreement on this score; he justifies the finding that Yokell's seemingly innocent request violated § 8 (a) (1) on the basis that the evidence of later violations gives it a color which it did not have on its face. While I do not quarrel with this approach, I find no sufficient evidence of other violations of § 8 (a) (1) of such gravity as to convert what on its face was a reasonable and lawful request into an infringement of § 7 rights.
 
 
 20
 The first of these other alleged violations is the taking of the secret poll at the beginning of the April 12 meeting. The Board itself seems to have recognized that one of the Yokells' purposes was to determine whether the Union's claim of majority status, made earlier the same day, was well founded. However, it faulted the employer because in its view the poll "was utilized by the respondents to induce the employees not to join the Union so that respondents could bargain directly with the employees," the latter conclusion being based on a part of a statement made by Eugene Yokell before the poll was conducted: "the reason that I gave out the ballots were [sic] to see if the majority of the people wanted the union to represent them, because if they did, then we had nothing to talk about, because we would have to talk with the union. If they didn't then we could go on with the meeting and see what our problems were, if any."
 
 
 21
 Apart from the italicized sentence, taking the poll was entirely legitimate — it was much less suspect than the one in NLRB v. Lorben Corp., 345 F.2d 346 (2 Cir. 1965), where this court refused to enforce the Board's decision finding a violation of § 8(a) (1). See also NLRB v. Johnnie's Poultry Co., 344 F.2d 617 (8 Cir. 1965).[1] The italicized sentence seems utterly innocent to me. Yokell properly recognized that if the poll confirmed the union's claim to a majority, he could not lawfully proceed. On the other hand, if the poll should negate the union's claim or cast reasonable doubt upon it, he was free at least to see what the employees' gripes were, to ascertain what the union was proposing to do about them, and to argue that the latter's representations were unattainable, NLRB v. River Togs, Inc., supra; NLRB v. Golub Corp., supra, although even as to that he must carefully observe the shadowy line dividing a prediction from a "threat of reprisal." Whether he could go beyond this by indicating possible willingness to do something about complaints is debatable. The problem arises from the difficulty — perhaps the impossibility — of distinguishing what the employer would have been willing to do apart from the union's appearance and what he offers as a result of it, and I assume that on this account Congress did not transgress the First Amendment when it excluded a "promise of benefit" from the protection of § 8(c). About all we know as to either the promise or the actual grant of benefits is that § 8(a) (1) "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). While one can hardly be dogmatic as to the application of so inexact a standard, at least an employer does not violate it merely by entertaining employee requests, cf. Bok, supra, 78 Harv.L.Rev. at 112-116, simply on the theory that the mere act of listening may imply some possibility of acceptance. Since Yokell did not say he would do more than this, his promise "to go on with the meeting" if the poll indicated he properly could should not infect otherwise legitimate action.[2]
 
 
 22
 I agree with my brothers that the grant of a Good Friday holiday and the later grant of extra vacation benefits were de minimis, see NLRB v. Ralph Printing and Lithographing Co., 379 F. 2d 687, 691-692 (8 Cir. 1967), and that the August wage increase must fairly be regarded as merely a substitute for the raises generally given in March or April, which the Yokells thought they could not grant this year because of the union's activities. However, they affirm the Board's order in this respect because of the color given by other alleged violations. In my view the only valid finding of violation relates to the threat to move the plant made during or after the April 12 meeting. Granting that the Board may, indeed must, consider the entire context of an employer's conduct, I do not believe this isolated comment justifies our affirming the Board's conclusion as to the illegality of an otherwise innocent wage increase granted four months later, or converts the otherwise de minimis benefits into more than they are. Indeed, the record is singularly unilluminating as to how much union activity was still going on when the later benefits were conferred.
 
 
 23
 I agree with the decision to deny enforcement to that part of the Board's order banning the Yokells from threatening "other reprisals."
 
 
 
 Notes:
 
 
 [1]
 The poll conducted here is clearly distinguishable from the one found illegal in Madison Brass Works, Inc. v. NLRB, 381 F.2d 854 (7 Cir. 1967), where the employer, after giving an anti-union speech, asked for a show of hands
 
 
 [2]
 NLRB v. Charles R. Krimm Lumber Co., 203 F.2d 194 (2 Cir. 1953), cited by the majority, does not require the decision here. In that case, the employer's course of conduct was much more coercive and the purpose of the poll, according to one of the proprietors, was clear — "it got out among the men that they [the employers] were against the Union." 97 N.L.R.B. 1574, 1586 (1952)