ST. LOUIS CAR DIVISION GENERAL STEEL INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 20450.

United States Court of Appeals, Eighth Circuit.

March 30, 1971.

Frank C. Mansfield, Belleville, Ill., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granof, Frank Vogl, Attys., N.L.R.B., Washington, D. C., for respondent.

Before VOGEL and ROSS, Circuit Judges, and STEPHENSON, Chief District Judge.

VOGEL, Circuit Judge.

St. Louis Car Division General Steel Industries, Inc., petitioner, asks this court to review and set aside an order of the National Labor Relations Board issued July 13, 1970, pursuant to § 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The Board filed a cross-application for enforcement of its decision and order which is reported at 184 N.L.R.B. No. 55. No questions of jurisdiction are involved. 29 U.S.C.A. §§ 160(e) and (f).

The only issue raised here is whether substantial evidence on the record as a whole supports the Board's findings that the St. Louis Car Division violated § 8(a) (1) of the Act by allegedly coercively interrogating employees concerning their union activities, by allegedly threatening an employee with loss of benefits if the union won an upcoming election, and by promising and granting certain salary increases as well as other benefits allegedly to influence the employees' attitudes toward the union. We conclude that the Board's findings are not supported by substantial evi-

dence on the record as a whole and accordingly we deny enforcement.

Petitioner is one of several divisions of General Steel Industries. St. Louis Car employs at its plant in St. Louis, Missouri, approximately 1200 employees, including some 900 production and maintenance workers who are represented by a local of the United Steelworkers of America. On January 10, 1969, Teamsters Local Union No. 688 filed a petition with the Board seeking certification as bargaining representative for a unit of 175 unrepresented clerical and technical employees. Some of the employees of this unit, timekeepers, inspectors and shop clerks, were paid hourly while others, clerical and keypunch operators, were salaried.

On April 15, 1969, the Board conducted an election which the Teamsters won 94 to 86 with one ballot challenged. Thereafter on May 28, 1969, following consideration of the company's objections to conduct affecting the result of that election, the Board's Regional Director set aside the election and directed a second one. On June 24, 1969, the Regional Director conducted the re-run election which the Teamsters lost 82 to 69 with 10 ballots challenged. The Teamsters filed objections to this election as well as unfair labor practice charges against the company. The two matters involving charges of the same alleged improper conduct were heard together.

Two isolated and trivial incidents form the basis for the Board's conclusion that the company violated § 8(a) (1) by coercively interrogating or threatening its employees. The first of these incidents was a conversation between Edward Hart, an employee in the engineering department, and Gary Woley, assistant to the vice president of engineering. The discussion took place approximately a month before the first election of April 24, 1969. Apparently Woley asked Hart "how the union was coming." Hart explained that

> "He [Woley] asked me, he had understood that I was involved pretty heavily in the union and asked me if

I had my mind made up and everything, and I said yes, and he said, well, all right. He says he hoped I knew what I was doing."

Hart specifically denied that Woley had predicted any benefit to or reprisal against Hart if he acted in a certain way toward the union or voted either way in the election and there is no evidence to the contrary.

The second alleged coercive interrogation occurred on June 13, 1969, between Michael Murphy, quality control manager for the company, and Larry Philpot, an inspector at the plant. At a meeting of supervisory inspectors Murphy announced a general wage increase effective as of June 1, 1969. Philpot asked what Murphy considered to be "unusual" questions. According to Philpot,

> "I asked Mr. Murphy that if the company had given us this 30 cent an hour increase, that if the vice president or someone who had authority couldn't turn around and take away this increase after the election."

Murphy replied:

> "* * * that the 30 cent an hour increase would be on our pay check that Friday and what more proof did we want than that."

Also, Philpot further related:

> "Well, I asked again wouldn't we have to have a written agreement, something on paper from either the office in Granite City between Mr. Murphy as the department head, or the company of St. Louis Car, that we were receiving this increase on paper to prevent, say, the company turning around and taking this increase in wages away from us after the election had taken place."

Murphy later called Philpot into his office and they had a prolonged conversation touching many matters, including only collaterally the recent union activity. In this conversation Murphy mentioned that he had once been a union member but now personally would prefer not to have a union in his department. They discussed problems Philpot was

having with certain individuals on his job. In the conversation Philpot asked Murphy for an additional ten cents an hour increase over the 30 cents announced and was told by Murphy that

"\* \* \* the 30 cent an hour increase was more than enough of an increase and that asking for 10 cents more an hour, that he felt that if I wanted 10 cents an hour more, that I ought to go out and look for another job, and I told him that I knew quality control inspectors at that time were kind of scarce as far as work from newspapers and he just felt like I should leave the company that afternoon."

The employee charged that others had received the dime additional increase, but Murphy denied this. Philpot also complained of treatment he received at the company dispensary. Philpot testified that there were no promises or threats made to him and that the way he would vote, whether for the union or against the union, was not even mentioned during their conversation. Murphy did say that there was a possibility that the educational benefits traditionally provided by the employer "may or may not [be] retain[ed] \* \* \* that it would be completely on a bargaining basis between the company and the union."

In circumstances where there is no background of antiunion animus by an employer, trivial and ambiguous conversations between the employer and an employee cannot form the basis of a § 8(a) (1) violation. See Broadway Motors Ford, Inc. v. N. L. R. B., 8 Cir., 1968, 395 F.2d 337, 340. Isolated conversations with two employees in a unit of 175 employees do not provide evidence of an attempt or an intent to discourage union membership or discriminate against those involved in union activity. There is no evidence on this record to indicate that these separate, inconsequential discussions were in any way in violation of the Act. In N. L. R. B. v. Gissel Packing Co., 1969, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547, the Supreme Court emphasized an employer's right as protected by the express terms of the Act

"\* \* \* to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' "

There is no evidence of such threats or promises in these conversations and there is no evidence that these conversations were intended or could reasonably be interpreted to have such a purpose or effect. Nor did the employer indicate that his future action on employee concerns would be "solely on his own initiative for reasons unrelated to economic necessities and known only to him \* \* \*." Gissel Packing Co., supra, 395 U.S. at 618, 89 S.Ct. at 1942. Lacking substantial evidence on the record as a whole, the Board order cannot be enforced for this court has a "responsibility for the reasonableness and fairness of Labor Board decisions \* \* \*." Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456. Even if these incidents were § 8(a) (1) violations supported by substantial evidence, and we reemphasize that they fall far short, the remarks were "such isolated and inconsequential" statements that enforcement would be improper. N. L. R. B. v. Talbot-General Wire Products, Inc., 8 Cir., 1969, 419 F.2d 824, 825.

The Board's other § 8(a) (1) charges are based upon the company's promises and grants of increases in wages and benefits before the second election. Generally, the improved compensation fell into three areas: First, there was a $40-50 per month increase in the pay of the keypunch operators; second, there was a general wage increase of 30 cents an hour; third, there was an improvement in the employees' hospitalization insurance program. After the election there was an aggregate cost of living wage increase for salaried employees other than the keypunch operators. In fact, at this time similar improvements were made for the employees of other divisions of

General Steel where there was then no union activity. These overall improvements were announced to the employees individually, in meetings, and through the distribution of booklets and letters. The use of the meetings to describe hospitalization benefits was apparently unprecedented compared to previous company procedure but was advised on this occasion by the insurance carrier.

The company had been aware of its lower than average wage scales and, in order to ameliorate problems of skilled labor shortages, had carried out an intensive comparative study of wage rates in similar job positions in the geographic area. While the company intended to announce and grant most of the increases called for by the study in May of 1969, the company's industrial relations manager felt that the action should be deferred until after negotiations which were being carried on with the Steelworkers were completed. He preferred that the floor in the negotiations with the union provided by existing employee benefits should not be altered during the course of the negotiations. As soon as the negotiations were complete the improvements were granted. The company felt that further delay would be unnecessary and possibly harmful to its overall economic interest in its existing labor posture. In any event, the uncontradicted testimony was that the company would, as a matter of consistent practice, improve the compensation and fringe benefits of the non-union employees substantially in the same amounts and, barring administrative delays, at approximately the same time as those improvements awarded to the Steelworkers through negotiations.

■■ There is no question but that the granting of benefits "immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect" violates § 8(a) (1). N. L. R. B. v. Exchange Parts Co., 1964, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435. The issue

here is whether substantial evidence on the record as a whole shows that the company had this unlawful purpose in granting these increases. We agree with the Trial Examiner that the record lacks this evidence and we set aside the Board's order and conclusions on this issue. In our review we may recognize "that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Universal Camera, supra, 340 U.S. at 496, 71 S.Ct. at 469.

■ The evidence shows that the company followed its regular routine in granting these benefits. If this were not so our analysis and conclusion might be quite different. See N. L. R. B. v. Southwire Company, 5 Cir., 1970, 429 F.2d 1050, 1056, cert. denied, 1971, 400 U.S. ——, 91 S.Ct. 932, 28 L.Ed.2d 218; N. L. R. B. v. Douglas and Lomason Company, 8 Cir., 1964, 333 F.2d 510, 514. Petitioner showed that its plans as to these improvements were clearly defined and established without regard to the Teamsters' campaign. We cannot find a purpose to discriminate against or discourage union membership on these facts. Rather, we observe that

" * * * as a practical matter, union campaigns are often carried on over a period of weeks, sometimes months, and we emphasize that the granting of normal and regular increases in employee benefits are not to be held to be an unfair labor practice merely because a union drive is in progress, a result which would work to the detriment of the very people whom the Act seeks to protect."

N. L. R. B. v. Yokell, 2 Cir., 1967, 387 F.2d 751, 756. In *Yokell* the court was satisfied that an improper purpose had been shown in the general circumstances of the employer's conduct. This essential element is missing in the instant litigation. See N. L. R. B. v. Cosco Prod-

ucts Company, 5 Cir., 1960, 280 F.2d 905, 909.

In all, none of the violations found by the Board is sustainable on this record.[1] Enforcement denied.

1. At this time we lack jurisdiction to review the Board's order of a third election. N. L. R. B. v. Falk Corporation, 1940, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; Marine Welding & Repair Works, Inc. v. N. L. R. B., 8 Cir., 439 F.2d 395 at pp. 399, 400 (1971); N. L. R. B. v. William J. Burns International Detective Agency, Inc., 8 Cir., 1965, 346 F.2d 897.