NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ROSWIL, INC., doing business as Ramey
Supermarkets, Respondent.

No. 94–2929.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1995.

Decided May 16, 1995.

Rehearing Denied July 7, 1995.

Donald W. Jones, Springfield, MO, argued, for respondent.

Margaret Lukes of the NLRB, Washington, DC, argued for petitioner.

Before LOKEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and JONES,* Senior District Judge.

LOKEN, Circuit Judge.

The National Labor Relations Board petitions to enforce its order requiring Roswil, Inc., to remedy violations of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3). The Board held that Roswil committed the unfair labor practices by disciplining two employees because they criticized their store manager during collective bargaining negotiations. We conclude that the Board abused its discretion in refusing to defer its proceedings until completion of a pending grievance-arbitration proceeding under the governing collective bargaining agreement. Accordingly, we deny enforcement.

## I. Background Facts.

On October 1, 1991, Richard Taylor, Roswil's president, met with representatives of the Congress of Independent Unions ("CIU") to negotiate a new collective bargaining agreement. CIU has represented Roswil employees since 1973. As the Board found, Roswil and CIU have a positive relationship, and they have employed their collectively bargained grievance-arbitration machinery "to good effect over a number of years." The October 1 negotiations were successful, producing accord on the terms of a new collective bargaining agreement that same day.

The CIU representatives at this bargaining session included Vickie Floyd and Shirley Holbrook, two checkers with over fifteen years experience at Roswil's supermarket in Houston, Missouri. During the bargaining meeting, in response to a routine question from Taylor about conditions at the Houston store, Floyd and Holbrook voiced a number of complaints about their relatively new store manager, Michael Kempton, including an allegation that Kempton was displaying favoritism toward another checker, with whom he was rumored to be having an affair. Fearing

---

* The HONORABLE JOHN BAILEY JONES, Senior United States District Judge for the District of South Dakota, sitting by designation.

reprisal by Kempton, the employees asked Taylor to keep their complaints confidential, and he assured them that he would.

Properly concerned about the rumored affair, Taylor directed Kempton's immediate supervisor, area store supervisor Jerry Iseminger, to investigate, without telling Iseminger the source of the rumors. Iseminger visited the Houston store three of the next four days. Though Iseminger did not accuse Kempton of having an affair (indeed Iseminger ultimately concluded that the rumors were false), the investigation angered Kempton, whose comments to another employee suggested that he attributed this scrutiny by his superior to something that was said at the October 1 negotiations.

*Holbrook is reprimanded.* On October 10, checker Holbrook ignored a request that she call manager Kempton to the front of the store. Kempton summoned Holbrook to the break room and, as the ALJ found, "told Holbrook that he didn't know what her problem was but that he would be watching her and he was going to write her up every time she turned around." That threat was the basis of the Board's § 8(a)(1) finding as to employee Holbrook; she suffered no other adverse action by Roswil.

*Floyd is discharged.* Floyd was the store's most experienced checker, and her duties included stocking health and beauty aid products, many of which must be rotated on the store shelves or they will not be sold before the manufacturer's expiration date. In mid-September, the independent supplier of these products, acting on a special request from her superiors, had pulled all outdated health and beauty aid products from the Houston store's shelves. These products were sitting in a shopping cart and in four "totes" in Kempton's office when Iseminger visited the store in early October. Iseminger expressed concern, and Kempton advised that Floyd was responsible. Iseminger told Kempton to find out the value of these outdated products.

In late October, Kempton reported to Iseminger that the outdated health and beauty aid products had a wholesale value of approximately $1000. After checking with Taylor, who confirmed that this was unacceptable,

Iseminger instructed Kempton to terminate Floyd's employ. On October 31, Kempton did so, in a stormy meeting in which Floyd accused Kempton of being "mad about something I've done." Because Floyd had received no warning or other lesser discipline for not properly rotating these products, she believed that Kempton caused her discharge in retaliation for her complaints at the collective bargaining session.

## II. Procedural History.

The next day, Floyd filed a grievance in accordance with the collective bargaining agreement between Roswil and CIU. The agreement provides that Roswil may "discipline and discharge employees for such cause as the Company in good faith determines to be desirable." The prescribed grievance and arbitration procedures are rapid. The parties must complete each grievance step within five working days and, if a matter remains unresolved, must submit it to an arbitration panel within ten days thereafter. Consistent with this expedited process, Article 11, Section 4(f), of the agreement provides that the arbitrators may not require Roswil

> to pay back wages under any grievance more than twenty (20) days retroactive to the date the arbitrator's decision is delivered to the Company or more than three (3) days prior to the date the grievance is first reduced to writing and presented to the Company.

On November 12, 1991, while her grievance was being processed by Roswil and CIU, Floyd filed a parallel unfair labor practice charge with the Board. On December 19, the Board's Supervisory Examiner denied Roswil's request that the Board defer its unfair labor practice investigation until Floyd's pending grievance was resolved. On December 30, the charge was amended to allege that Roswil committed an unfair labor practice when Kempton "threatened to discipline" Holbrook on October 10 because "she had engaged in union or other protected, concerted activities."

Floyd was rehired to her former position on January 13, 1992. The Board's administrative law judge conducted a three-day

hearing on July 30, August 20, and September 30, 1992. Most of the hearing concerned whether Roswil's stated reasons for Floyd's discharge, primarily the outdated health and beauty aid products, were pretextual. Taylor also testified that CIU's National Secretary–Treasurer had declined to go forward with Floyd's pending grievance until the Board completed its proceedings.

Following the hearing, the ALJ held that deferral was inappropriate because the collective bargaining agreement "indisputably prevents an arbitrator from granting the type of make-whole relief necessary to perpetuate the policies underlying the Act." On the merits, the ALJ found that Roswil violated § 8(a)(1) when Kempton threatened Holbrook and § 8(a)(1) and § 8(a)(3) when Iseminger and Kempton discharged Floyd. A three-member panel of the Board summarily affirmed but added a footnote regarding the deferral issue:

> Member Devaney would generally support deferral to the arbitral process even in those cases where it does not provide complete make-whole relief.

> In declining to defer to the arbitral process here, Member Devaney underscores the express restriction on backpay in the contractual grievance and arbitration procedure; [Roswil's] hostility to the exercise of employee rights as manifested in its 8(a)(1) threat to Shirley Holbrook; and [CIU's] refusal to proceed with Floyd's grievance until the Board decides this matter. *Cf. Cone Mills Corp.*, 298 N.L.R.B. 661, 667 fn. 19, 1990 WL 122511 (1990).

### III. To Defer or Not To Defer

What counsel in this case have loosely referred to as the doctrine of "deferral" arises in at least three distinct procedural settings. The question may be, as in this case, whether the Board should defer adjudication of an unfair labor practice charge until pending grievance-arbitration proceedings are completed, in effect requiring the parties to exhaust arbitration remedies. *See Hammontree v. NLRB*, 925 F.2d 1486 (D.C.Cir. 1991) (en banc). Or the question may be whether the Board should honor a pre-arbitration settlement between employer and union that compromised an employee's grievance later presented as an unfair labor practice charge. *See Plumbers & Pipefitters Local Union No. 520 v. NLRB*, 955 F.2d 744 (D.C.Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). Or the question may be whether the Board should give deference or even collateral estoppel effect to an arbitration award in a subsequent unfair labor practice proceeding. *See Darr v. NLRB*, 801 F.2d 1404 (D.C.Cir.1986). These questions are interrelated, but it is important to keep them distinct.

■ Deferral issues occur because of the tension between two robust components of federal labor law, the power of the Board to remedy unfair labor practices, and "the strong federal policy favoring arbitration of labor disputes." *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 382, 94 S.Ct. 629, 638, 38 L.Ed.2d 583 (1974). The Board's power is of course statutory, *see* 29 U.S.C. § 160(a), but so, too, is the policy favoring arbitration, *see* 29 U.S.C. § 173(d) ("Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes"). Thus, while deferral is a matter committed to the Board's discretion, that discretion must be exercised with due regard for both statutory policies.

The Board initially adopted a discretionary deferral policy that the Supreme Court quoted approvingly in *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 270–71, 84 S.Ct. 401, 408–09, 11 L.Ed.2d 320 (1964):

> [T]he Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award.... However, it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.

*International Harvester Co.*, 138 N.L.R.B. 923, 925 (1962), *aff'd sub nom.*, *Ramsey v. NLRB*, 327 F.2d 784 (7th Cir.), *cert. denied*,

377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964). In its early cases, the Board considered whether to give deference to an arbitration award or an arbitrator's findings. The question at issue here, pre-arbitration deferral, arose shortly thereafter. The first pre-arbitration case in which the Board applied its deferral policy involved an alleged § 8(a)(5) violation that turned on a question of collective bargaining agreement interpretation that could be submitted to grievance and arbitration. *See Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971). Courts upheld as "clearly valid" the Board's decision in *Collyer* that it should, in appropriate cases, postpone its own proceedings until an available arbitration remedy has been completed. *Local Union No. 2188, IBEW v. NLRB,* 494 F.2d 1087, 1090 (D.C.Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974).

■ Section 8(a)(5) charges typically involve disputes between employer and union over the results of their collective bargaining. In contrast, § 8(a)(1) and § 8(a)(3) charges are typically brought by employees seeking remedy for infringement of their right to engage in protected collective activity. The protection of this right of individuals is a core Board enforcement obligation. Not surprisingly, therefore, the Board has waffled in the past twenty years over whether it should *ever* postpone a § 8(a)(1) or § 8(a)(3) proceeding pending completion of a parallel arbitration. The Board first extended *Collyer* to §§ 8(a)(1) and (3) cases in *National Radio Co.,* 198 N.L.R.B. 527, 1972 WL 5055 (1972), but then overruled *National Radio* in *General Amer. Transp. Corp.,* 228 N.L.R.B. 808, 1977 WL 8457 (1977). Most recently, the Board overruled *General American* and reinstated *National Radio* in *United Technologies Corp.,* 268 N.L.R.B. 557, 1984 WL 36028 (1984). In *Hammontree,* the en banc D.C. Circuit approved the current *National Radio/United Technologies* policy. 925 F.2d at 1500. We agree with the *Hammontree* decision.

■ In *United Technologies,* the Board borrowed from *Collyer* in fashioning a multi-factor test to determine when pre-arbitral deferral is appropriate in § 8(a)(1) and § 8(a)(3) cases:

—whether the dispute "arose within the confines of a long and productive collective bargaining relationship" between employer and union;

—whether there is a "claim of employer animosity to the employees' exercise of protected rights";

—whether the collective bargaining agreement "provided for arbitration in a very broad range of disputes";

—whether the arbitration clause "clearly encompasse[s] the dispute at issue";

—whether the employer has "asserted its willingness to utilize arbitration to resolve the dispute"; and

—whether the dispute is "eminently well suited to resolution by arbitration."

268 N.L.R.B. at 558. This is still the Board's standard. *See August A. Busch & Co. of Mass., Inc.,* 309 N.L.R.B. 714, 716, 1992 WL 363331 (1992). Yet in this case neither the ALJ nor the Board analyzed the issue in terms of, or even made mention of, this governing standard. Indeed, the cases relied upon by the Board in refusing to defer involved either post-award deference questions, or pre-arbitral deferral of § 8(b)(4)(A) questions that arbitration could not possibly have resolved.[1] On appeal, Board counsel devoted one page of their brief to this issue and failed to provide us the *United Technologies* standard.

■ We could simply remand this case because the Board ignored its own governing standard. But that disposition might further frustrate the very policy the Board has ignored, by keeping this dispute out of a more appropriate collectively bargained remedial mechanism even longer. Therefore, before determining the correct disposition of this appeal, we will examine the dispute in light of the *United Technologies* factors, as the Board should have done, bearing in mind that these are discretionary factors that are

---

1. The ALJ and Member Devaney cited *Cone Mills Corp.,* 298 N.L.R.B. 661, 1990 WL 122511 (1990); *Ironworkers District Council,* 292 N.L.R.B. 562, 1989 WL 223819 (1989); and *American Commercial Lines, Inc.,* 291 N.L.R.B. 1066, 1988 WL 214269 (1988).

not normally to be applied in the first instance by a reviewing court.

■ It is undisputed that Floyd's unfair labor practice charge meets four of the six factors favoring deferral: the ALJ found that Roswil and CIU have "a long and productive collective bargaining relationship"; the grievance-arbitration mechanism covers a broad range of disputes and "clearly encompasses" this dispute; and Roswil has asserted its willingness to arbitrate.

■ The sixth *United Technologies* factor may well be the most important—whether Floyd's dispute with Roswil is well-suited to resolution by arbitration. For a number of reasons, we believe that the Board, had it addressed this question, would have answered it in the affirmative.

■ *First,* Floyd herself invoked the collectively bargained remedy before she filed her unfair labor practice charge. An employee's "voluntary invocation of the contractual dispute resolution mechanism and the union's active role in negotiating for favorable treatment are factors which militate in favor of deferral." *Lewis v. NLRB,* 800 F.2d 818, 821 (8th Cir.1986). Here, there is no evidence that CIU was anything but supportive of Floyd's grievance; indeed, counsel for CIU represented her interest as charging party at the Board hearing.

*Second,* the collective bargaining agreement remedy was certain to be faster than the Board's remedy. Had the Board's staff not "jumped into the fray," in the words of *United Technologies,* 268 N.L.R.B. at 559, Floyd's grievance would have been settled or arbitrated within weeks of her discharge. Given the ALJ's ultimate findings of fact, and Roswil's unilateral decision to rehire Floyd on January 13, 1992, it seems likely that Floyd would have been rehired sooner, perhaps with twenty days back pay, if the Board's staff had correctly applied the agency's deferral policy.

■ *Third,* Floyd had a *better* chance to prevail in arbitration than before the

Board. To prove her unfair labor practice charge, Floyd had to prove (i) that her informal complaints about Kempton were protected activity, (ii) that Iseminger and Kempton lied about why she was discharged, (iii) that the real reason for her discharge was Kempton's retaliation for her complaints, and (iv) that this constituted anti-union animus by Roswil. On the other hand, to prevail under the contract in arbitration, Floyd only had to prove that her discharge was not for a cause determined by Roswil in good faith.[2] The Board's hearing record makes a rather strong case that Floyd's discharge was arbitrary, whether or not it was also an unfair labor practice. Floyd (and therefore Board staff) should have welcomed immediate arbitration.

The second *United Technologies* factor is the most problematic—whether this dispute involves a "claim of employer animosity to the employees' exercise of protected rights." Virtually all § 8(a)(1) and § 8(a)(3) charges involve claims of employer animosity to employee protected rights. This factor was borrowed from *Collyer,* which dealt with § 8(a)(5) cases where anti-union animus is often not a factor. But the question in *United Technologies* was whether to defer a § 8(a)(1) charge that the employer had threatened an employee with discipline if she persisted in processing a grievance. Even though that was clearly a claim of employer animosity to the exercise of a protected right, the Board held that "[t]he facts of this case make it eminently well suited for deferral." 268 N.L.R.B. at 560.

■ Based on the facts and holding of *United Technologies,* we must conclude that the second factor is not intended to preclude deferral of all § 8(a)(1) and § 8(a)(3) cases, but only those in which the alleged employer animosity puts in doubt the fairness or integrity of the alternative grievance-arbitration remedy. *See, e.g., NLRB v. United States Postal Serv.,* 906 F.2d 482, 490 (10th Cir. 1990), affirming the Board's refusal to defer because the employer's pattern of reprisals had rendered the grievance-arbitration ma-

---

2. Taylor testified that a discharge because of an employee's protected union activity would not be in good faith. Thus, an arbitration remedy was available for the unfair labor practice found by the Board, as well as for other types of bad faith.

chinery meaningless and futile. As the Board said in *Consolidated Freightways Corp.*, 288 N.L.R.B. 1252, 1256, 1988 WL 213919 (1988), if private dispute-resolution mechanisms exist and are adequate, "the clear import of *United Technologies* is that ... the Board will stay its hand and afford the private grievance-arbitration machinery the first opportunity to decide the issue, regardless of the identity of the charging party."

Board Member Devaney apparently invoked this second *United Technologies* factor when he declined to defer because of Roswil's "hostility to the exercise of employee rights as manifested in its 8(a)(1) threat to Shirley Holbrook." This reasoning is unpersuasive. First, the perspective is wrong; it is using hindsight—the ALJ's ultimate findings as to Holbrook—to decide the threshold issue of deferral. Second, the deferral question was decided by Board staff on December 19, 1991, before the alleged threat to Holbrook was even part of the charge. Finally, this isolated threat by a low-level manager, Kempton, is arguably insufficient to support a § 8(a)(1) violation;[3] it is clearly insufficient to cast doubt on the integrity of the Roswil–CIU grievance-arbitration machinery.

For the foregoing reasons, we conclude that, if the Board had followed its own precedents and fairly applied the *United Technologies* factors, it would have deferred to Floyd's pending grievance. There remain to be considered the two additional reasons not to defer given by the ALJ and Member Devaney.

■ Member Devaney declined to defer in part because of "the Union's refusal to proceed with Floyd's grievance until the Board decides this matter." The evidentiary basis for this reason is slim. There is no evidence as to when and why CIU decided that it would not continue processing the grievance. If that decision came after the Board refused to defer, it may have reflected, not so much a refusal, as a bow to the inevitable. But there is a more important objection to this reasoning which the Board itself has repeatedly stated:

Being keenly aware of the limited resources of this Agency, we are not particularly desirous of inviting any labor organization ... to bypass [its] own procedures and to seek adjudication by the Board of the innumerable individual disputes which are likely to arise in the day-to-day relationship between employees and their immediate supervisors.

*United Aircraft Corp.*, 204 N.L.R.B. 879, 880, 1972 WL 4408 (1973), *aff'd sub nom., Lodges 700, 743, 1746, Machinists Union v. NLRB*, 525 F.2d 237 (2d Cir.1975), quoted in *United Technologies*, 268 N.L.R.B. at 559. In other words, absent a showing that the interests of the union and the grieving employee are adverse, whether the union would prefer that the Board go first should be irrelevant.

■ Finally, both the ALJ and Member Devaney declined to defer in this case because the Roswil–CIU collective bargaining agreement appears to limit the arbitrators to an award of twenty days back pay. We agree that the scope of available collective bargaining agreement remedies is relevant to the question of pre-arbitral deferral. But the Board has repeatedly stated that it will not "automatically refuse to defer in all situations involving arbitration awards that provide incomplete make-whole remedies, or remedies not otherwise totally consistent with Board precedent." *Cone Mills Corp.*, 298 N.L.R.B. at 667 n. 19. This is not surprising, for the Board has in the past honored union-employer settlement agreements that compromised an employee's grievance and parallel unfair labor practice charge. *See Plumbers & Pipefitters*, 955 F.2d at 749–50.

■ In these circumstances, the Board's categorical position that this remedial limitation precludes deferral is inexplicable. The back pay limitation in question is obviously related to the parties' desire to streamline and expedite their grievance-arbitration mechanism, a desirable goal. The limitation is ambiguously drafted, and there is no evidence that it would prohibit greater awards if, for example, Roswil unreasonably

---

**3.** *See St. Louis Car Division v. NLRB*, 439 F.2d 1145, 1148 (8th Cir.1971); *Broadway Motors Ford, Inc. v. NLRB*, 395 F.2d 337, 340 (8th Cir.1968).

delayed the grievance-arbitration process. Moreover, pre-arbitral deferral is "merely the prudent exercise of restraint, a postponement of the use of the Board's processes." *United Technologies,* 268 N.L.R.B. at 560. If Floyd were dissatisfied with the back pay awarded in arbitration, she could seek to reopen her unfair labor practice charge. *See Lewis,* 800 F.2d at 821. At that point, the Board could consider the scope-of-remedy question on a far better record.

For the foregoing reasons, the Board's petition for enforcement is denied. We suggest that Roswil end this overly-protracted dispute by paying Floyd twenty days backpay.